No. 14534

IN THE SUPREME COURT OF THE STATE OF MONTANA

1981

_____

STATE OF MONTANA,

Plaintiff and Respondent,

vs.

LARRY L. BLAKNEY,

Defendant and Appellant.

_____

Appeal from:  District Court of the Fourth Judicial District,
In and for the County of Missoula
Honorable Jack L. Green, Judge presiding.

Counsel of Record:

For Appellant:

Smith, Connor & Van Valkenburg, Missoula, Montana
Fred Van Valkenburg argued, Missoula, Montana

For Respondent:

Hon. Mike Greely, Attorney General, Helena, Montana
Mary B. Troland argued, Assistant Attorney General,
 Helena, Montana
Robert L. Deschamps, III County Attorney, Missoula, Montana

_____

Submitted:  October 19, 1981

Decided:   FEB 25 1982

FEB 25 1982

Filed:

_Thomas J. Kearney_
_____
                    Clerk

Mr. Justice John Conway Harrison delivered the Opinion of the Court.

This case is before the Court on remand from the United States Supreme Court for reconsideration in light of Edwards v. Arizona (1981), ___ U.S. ____, 101 S.Ct. 1880, 68 L.Ed.2d 378. Blakney v. State of Montana, No. 79-6366. This Court reheard the case en banc on October 19, 1981, after both the State and the appellant submitted new briefs.

The facts involved are discussed fully in our opinion in State v. Blakney (1979), ___ Mont. ___, 605 P.2d 1093, 36 St.Rep. 2193, and need not completely be repeated here. However, when certain facts are considered together with those in Edwards, it becomes apparent that Edwards is inapposite both factually and legally to the case before us.

The crime for which the appellant was convicted occurred on the evening of Friday and Saturday, June 10 and 11, 1977. The appellant was not arrested until June 14, 1977. He was interviewed by the police on four separate occasions. Before each interview the appellant was advised of his rights and signed separate waivers to those rights. Between interviews, the appellant was not detained and was free to consult his friends and an attorney, if he desired one. A polygraph examination that took place between the second and the third interviews indicated appellant was not telling the truth. After this examination appellant confessed. In the fourth interview a tape was made of that confession.

In Edwards, supra, the defendant was arrested and informed of his Miranda rights. He acknowledged his understanding of those rights and was then interrogated. During questioning he indicated a desire to speak to an

-2-

attorney. At that point the interrogation ceased, and he was returned to his jail. The next day, after Edwards told the detention officers he did not wish to speak with anyone, he was informed that he had to talk with officers there to interview him. After those officers played a taped statement of an alleged accomplice of Edwards, he made a statement to them about his part in the crime.

The United States Supreme Court held that the use of Edwards' confession against him at trial violated his rights under the Fifth and Fourteenth Amendments as construed in Miranda v. Arizona (1966), 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694. The Court enunciated two distinct grounds for disapproving the Arizona Supreme Court's judgment.

First, the Court found that the state court had applied an "erroneous standard" in determining a waiver because it did not focus on the "knowing and intelligent" aspect of Edwards' purported waiver separately from the issue of voluntariness. According to the Supreme Court, consideration of an alleged waiver of right to counsel under the Fifth Amendment requires this two-pronged evaluation.

The Supreme Court also reconfirmed and clarified its ruling in Miranda v. Arizona, supra, that when an accused asserts his right to counsel during a custodial interrogation, the interrogation must cease until an attorney is present. Justice White, speaking for the Court said:

> ". . . although we have held that after initially being advised of his Miranda rights, the accused may himself validly waive his rights and respond to interrogation, see, North Carolina v. Butler supra, at 372-376, the Court has strongly indicated that additional safeguards are necessary when the accused asks for counsel; and we now hold that when an accused has invoked his right to have counsel present during custodial inter-

rogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. We further hold that an accused, such as Edwards, having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges or conversations with the police." Edwards v. Arizona, ___ U.S. at ___, 101 S.Ct. at 1884, 68 L.Ed.2d at 386.

Here, the trial judge, in an order denying a motion to suppress evidence and to change venue, issued complete findings of fact and conclusions of law. That order, which followed a full hearing, was not fully contained in our previous opinion, but is here set forth in toto:

"FINDINGS OF FACT

"1. That the defendant was interviewed by the police three times with the last interview being preceeded [sic] by a polygraph examination. The first interview began at 11:23 p.m. on June 11, 1977 and finished about 12:56 a.m. on June 12; the second interview began at 9:51 a.m. on June 12 and ended sometime between noon and 1:00 p.m.; the third and final interview began at 9:20 p.m. on June 13 and finished around 10:45 p.m. on the same date.

"2. That the defendant always had a close relative either with him or nearby during each of his interviews with the police, and on several occasions during the breaks in the interviews, the defendant privately consulted with these relatives.

"3. That between each interview the defendant was allowed to return home, with the time for the next interview session being mutually agreed upon by the defendant and the interviewing officers.

"4. That the defendant was thoroughly instructed on his 'Miranda' rights prior to each interview and on each occasion, after having any questions answered, he acknowledged he understood his rights and signed a written waiver of his rights.

"5. That the defendant has an I.Q. of 94;

-4-

has attended high school and a vocational technical center; has passed four-fifths of the grade equivalency diploma (G.E.D.) examination; and has demonstrated an adequate adult command of the English language during police interviews and in his courtroom testimony.

"6. That a tape recording of the defendant's polygraph examination clearly indicates that the defendant was not threatened or intimidated by the procedures used.

"7. That on two occasions the defendant brought up the subject of an attorney. The first occasion was during the June 12 interview when the defendant asked the police if they thought he should get an attorney, to which the police responded that this decision was up to him. After receiving this advice the defendant voluntarily resumed talking to the police.

"The second occasion was after the polygraph examination on June 13 when the defendant stated 'Maybe I should have an attorney'. With this, the police stopped talking to the defendant and began to leave the room, but before they were able to leave the defendant resumed talking to them. At this point, the defendant was reminded that he had just indicated he wanted an attorney, to which the defendant responded that he did not want a lawyer. With this the interview continued.

"8. That the defendant was not in police custody for a day and one-half between his first mention of an attorney and his next interview, but during this time made no effort to secure or consult with an attorney.

"9. That no facts have been offered showing actual prejudice in the community against the defendant.

"From the foregoing findings of fact, the Court now makes its:

"CONCLUSIONS OF LAW

"1. That the defendant was competent to understand his constitutional rights and intelligently and knowingly waived them.

"2. That the statements made by the defenant [sic] were voluntary and were therefore not gained in violation of his constitutional rights.

"3. That the defendant never made an effec-

-5-

tive assertion of counsel and in any event thereafter knowingly and intelligently waived the presence of counsel by spontaneously stating he did not want a lawyer and resuming talking to the police.

"4. That the court cannot determine that there is any actual prejudice in the community against the defendant thereby precluding him from having a fair trial."

In spite of the Supreme Court's apparent need to reconfirm Miranda, it is our opinion the Court did not intend to impede legitimate methods of law enforcement by further expanding Miranda:

"In concluding that the fruits of the interrogation initiated by the police on January 20 could not be used against Edwards, we do not hold or imply that Edwards was powerless to countermand his election or that the authorities could in no event use any incriminating statements made by Edwards prior to his having access to counsel. Had Edwards initiated the meeting on January 20, nothing in the Fifth and Fourteenth Amendments would prohibit the police from merely listening to his voluntary, volunteered statements and using them against him at the trial. The Fifth Amendment right identified in Miranda is the right to have counsel present at any custodial interrogation. Absent such interrogation, there would have been no infringement of the right that Edwards invoked and there would be no occasion to determine whether there had been a valid waiver. Rhode Island v. Innis, supra, makes this sufficiently clear. 446 U.S., at 298, n 2." Edwards v. Arizona, ____ U.S. at ____, 101 S.Ct. at 1885, 68 L.Ed.2d at 387.

On reconsideration the appellant contends that the Montana courts' rulings on his confession suffer from the same inadequacy as the ruling rendered against Edwards by the Arizona Supreme Court--failure to meet the two-pronged test of a "voluntary" and "knowing and intelligent" waiver. A careful review of this case, however, reveals that in actuality both the District Court and this Court carefully adhered to the principles enunciated by the

Supreme Court in Edwards for determining the validity of the appellant's waiver of the right to counsel.

Edwards makes clear that judging waiver of the right of counsel under the Fifth Amendment necessarily entails a finding of a knowing and intelligent relinquishment of a known right. Although Edwards does not fully discuss the factors relevant to making such a finding, the cases cited in that opinion set forth the pertinent areas of inquiry into the issue.

According to Johnson v. Zerbst (1938), 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461, 1466, the existence of a valid waiver "must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." Other appropriate considerations include the age, education, and intelligence of the accused, and his capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights. Fare v. Michael C. (1979), 442 U.S. 707, 725, 99 S.Ct. 2560, 2572, 61 L.Ed.2d 197, 212; North Carolina v. Butler (1979), 441 U.S. 369, 373, 99 S.Ct. 1755, 1758, 60 L.Ed.2d 286, 292; Faretta v. California (1975), 422 U.S. 806, 835, 95 S.Ct. 2525, 2541, 45 L.Ed.2d 562, 581. In addition, a valid waiver must include not merely a comprehension of the benefits being abandoned, but also an actual relinquishment of those benefits, as evidenced by the actions or statements of the accused. Brewer v. Williams (1977), 430 U.S. 387, 404-405, 97 S.Ct. 1232, 1242, 51 L.Ed.2d 424, 439-441.

In denying appellant's motion to suppress, the Dis-

trict Court, after a full hearing, explicitly concluded that the appellant "was competent to understand his constitutional rights and intelligently and knowingly waived them." See Conclusion of Law No. 1. In support of that conclusion, the court made specific findings of fact on many of the same considerations approved by the Supreme Court in Edwards and its predecessor cases. See Findings of Fact Nos. 4 and 5. As noted in our original opinion, each of these findings had adequate support in the record of the suppression hearing.

In addition, the appellant's conduct and statements during and between his interviews with the police and at the time of the waivers of his right to counsel were thoroughly examined by the trial court. The court noted that the appellant, although at liberty for a day and a half between his first mention of counsel and his next interview session, made no attempt to consult an attorney. See Finding of Fact No. 8; cf., Brewer v. Williams, 430 U.S. at 404-405, 97 S.Ct. at 1242, 51 L.Ed.2d at 439-441 (in which the United States Supreme Court noted Williams' continual reliance on the advice of counsel). The trial court also specifically described the overt actions of the appellant manifesting waiver of his previously-asserted right to counsel and his explicit statement in the crucial interview that he did not want a lawyer. See Finding of Fact No. 7.

On review, this Court examined even more fully the knowing and intelligent quality of appellant's actions, using the principles enunciated in the cases cited in Edwards. The pertinent factors examined included the age of the accused, his education, his knowledge of the nature of his Fifth Amendment rights, his mental capacity, his

-8-

previous experience with the criminal justice system, and his experience in the adult world. State v. Blakney, ___ Mont. at ___, 605 P.2d at 1096-1097, 36 St.Rep. at 2196.

It is true these considerations were undertaken in that part of our the opinion allocated to the determination of "voluntariness" of the appellant's confession. However, our established rules for judging voluntariness, as set forth in the Blakney decision, plainly encompass, both legally and logically, an assessment of the knowing and intelligent quality of the actions of the accused as that assessment has been prescribed by the United States Supreme Court in the waiver cases considered above. As to this aspect of "voluntariness," this Court previously found:

> "The trial court here reviewed the evidence and determined appellant voluntarily confessed. In considering almost every one of the factors listed above as relevant in determining the voluntariness of appellant's confession, evidence exists supporting the holding of the District Court.

> "Appellant was 18, legally an adult. He had passed most of his high school equivalency examination and attended vo-tech school. Appellant's IQ is 94, within the normal adult range. The trial judge found that appellant demonstrated an understanding of the English language during his courtroom testimony. Appellant had worked in his father's business. Appellant had prior experience with the criminal justice system, having previously been advised of his rights in connection with juvenile matters . . . Between sessions, appellant went home, free to consult with family members and move about as he pleased." State v. Blakney, ___ Mont. at ___, 605 P.2d at 1096-1097, 36 St.Rep. at 2196.

The Court also found that prior to each interview with the police, the appellant was informed of his Miranda rights and signed written waivers.

Recognizing the existence of some conflicting evi-

dence, this Court determined that there was, in fact, sufficient evidence to support the record for a finding of "voluntariness." We find that this determination was correct, that it constitutes a valid decision both on the actual voluntariness of the appellant's actions and on the knowing and intelligent quality of the appellant's waiver of the right to counsel and his subsequent confession. Having reviewed and fully evaluated the factors pertinent to waiver, as set forth by the United States Supreme Court in Edwards, and having found ample evidence in the record to justify the conclusions already reached, we find no reason to reverse this Court's earlier ruling on "voluntariness."

The second phase of the decision in Edwards, supra, dealt with the sequence of events leading to the uncounseled confession of the accused. The pivotal reason given by the United States Supreme Court for finding the purported waiver of right to counsel invalid was that the police, rather than Edwards, initiated the renewed questioning after the right to counsel had been asserted. We have previously set forth the Court's ruling in that matter.

A great deal of testimony heard by the District Court related to events or observations occurring while appellant was making his statement at the police station. This evidence is relevant only to the extent it supports or impeaches the credibility of the witnesses, or tends to show the appellant's condition at the time he was at the police station. The appellant's understanding in making the statement is relevant only insofar as it, too, bears on his condition and state of mind when he made the statement or as it aids in weighing the credibility of the police officers

involved. The central question on this motion, then, is whether the State has proved by a preponderance of the evidence that the appellant was advised of his constitutional rights and whether he knowingly waived them and voluntarily gave a statement. This standard of the burden of proof which the State must meet as to the voluntariness of a confession was set by the United States Supreme Court in Lego v. Twomey (1972), 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618, where it was held that a trial court need be satisfied "only by a preponderance of the evidence," as opposed to the standard of proof beyond a reasonable doubt.

The question of voluntariness in the instant case is complicated as to the facts of what occurred at the police station. Ordinarily, it is the fact-finder at trial who determines if the statement was in fact made and what was said.

The factors a court is to consider in determining whether a confession or admission was voluntary are set forth in a number of cases. In Schneckloth v. Bustamonte (1973), 412 U.S. 218, 226, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854, 862, the Court held:

> "In determining whether a defendant's will was overborne in a particular case, the Court has assessed the totality of all the surrounding circumstances--both the characteristics of the accused and the details of the interrogation. Some of the factors taken into account have included the youth of the accused . . . lack of education . . . intelligence . . . lack of any advice to the accused of his constitutional rights . . . length of detention . . . repeated and prolonged nature of the questioning . . . and the use of physical punishment such as deprivation of food or sleep. . ."

Other factors were mentioned in Culombe v. United States (1961), 367 U.S. 568, 601-602, 81 S.Ct. 1860, 1878, 6

L.Ed.2d 1037, 1057:

> ". . . extensive cross-questioning (of defendant). . . undue delay in arraignment . . . failure to caution the prisoner (as to his constitutional rights) . . . refusal to permit communication with friends and legal counsel . . . duration and conditions of detention . . . the manifest attitude of the police toward him, (and) his physical and mental state. . ."

Appellant urges that the attitude of the police officers here made his confession involuntary in that they believed he was responsible for the murder. It is significant that the appellant does not himself claim that the manifest attitude of the police caused him to say anything. It is his attorney who argues that it would have had that effect.

Although the appellant was young, he had had prior contact with the police. However, appellant does not claim that he had been held incommunicado, had been subjected to prolonged questionings, had any mental problems, was lacking in intelligence or had been tricked into giving a confession.

As we have previously noted, this case is clearly distinguishable from Edwards. Here, both the District Court and this Court found that the appellant asserted his right to counsel and that the police ceased their interrogation. It was the appellant himself who resumed his dialogue with the authorities. In the critical interview session leading to the contested confession, police officers reminded the appellant, before proceeding further, that he had requested an attorney. The appellant not only continued to talk with them but also specifically stated he did not want counsel. See Finding of Fact No. 7. Thus, in this case each

assertion of the right to counsel was followed by the appellant's own reinstigation of the conversation with the police officers.

It is clear, therefore, that this case is not controlled by the specific holdings in Edwards concerning police-initiated interrogation following an unfulfilled request for counsel by the accused. Justice White in Edwards did discuss a proper scope of judicial inquiry in a situation such as that presented here, where the police actively participated in an exchange initiated by the accused:

> "If, as frequently would occur in the course of a meeting initiated by the accused, the conversation is not wholly one-sided, it is likely that the officers will say or do something that clearly would be 'interrogation.' In that event, the question would be whether a valid waiver of the right to counsel and the right to silence had occurred, that is, whether the purported waiver was knowing and intelligent and found to be so under the totality of the circumstances, including the necessary fact that the accused, not the police, reopened the dialogue with the authorities." Edwards v. Arizona, ___ U.S. at ____, 101 S.Ct. at 1885, n. 9, 68 L.Ed.2d at 387, n. 9.

In this case both the District Court and this Court previously determined the "necessary fact" that it was the appellant who reinitiated the colloquy with the authorities. In addition, the knowing and intelligent quality of the appellant's actions, under the totality of the circumstances, was addressed by this Court in its original opinion and decided adversely to the contentions of the appellant. Thus, the determination required by the Supreme Court as described in the above-quoted footnote has already taken place under the circumstances of the appellant's case and is properly based on the record.

The appellant also argues there is insufficent evidence to demonstrate that he knew the essence of his right to counsel and that he did not validly waive that right. In support of this claim, the appellant alleges various "unacceptable" circumstances leading to his confession. However, the allegations now presented by the appellant as to his lack of understanding were fully presented to this Court before its previous decision. This Court found sufficient evidence in the record to support the District Court's findings and conclusions on the factors relevant to a knowing waiver. The Court also made its own findings on the record as to other pertinent factors relating to appellant's ability to understand his rights. See State v. Blakney, ____ Mont. at ____, 605 P.2d at 1096-1097, 1098, 36 St.Rep. at 2196-2197. Appellant points out that the State has a heavy burden to show the waiver and that some of the evidence at the suppression hearing was conflicting. He has, however, offered no cognizable justification for this Court now to backtrack from its original determinations. Neither the Edwards decision, the cases cited therein, nor the record in this case require this Court to reverse its earlier holding that the appellant's confession was admissible.

As an alternative request for relief, the appellant urges the case be returned to the trial court for a rehearing on the issue of knowing and intelligent waiver. A review of the transcript of the original suppression hearing reveals that the factual questions pertinent to the issue were fully investigated by both the State and the appellant at the original proceedings. In addition, the trial court entered specific findings and conclusions on whether the

-14-

appellant could and did waive his right to counsel. We therefore find no necessity for a rehearing.

We have reviewed the record carefully in light of the decision in Edwards v. Arizona, supra, and find that neither the facts nor the legal principles announced in that decision require a substantive change in our earlier opinion. Therefore, we affirm our holding that appellant's confession was admissible at trial.

_____
Justice

We concur:

_____
Chief Justice

_____

_____

_____

_____
Justices

Mr. Justice John C. Sheehy dissenting:

With suitable respect, I read the majority opinion as sidestepping the review required of us under the remand of the United States Supreme Court in the light of Edwards v. Arizona (1981), ____ U.S. ____, 101 S.Ct. 1880, 68 L.Ed.2d 378. The majority opinion seems to be a justification of its earlier opinion, one that the United States Supreme Court has remanded as possibly unjustifiable. Blakney's confession, says the majority here, was voluntary; ergo, the waiver of counsel by Blakney was knowing and intelligent. I do not agree.

In Edwards, we are reminded that under Schneckloth v. Bustamonte (1973), 412 U.S. 218, 246, 93 S.Ct. 2041, 2057, 36 L.Ed.2d 854, 874, the voluntariness of a consent or admission on one hand, and a knowing and intelligent waiver on the other, are discrete inquiries. Edwards, ____ U.S.____, 101 S.Ct. at 1884, 68 L.Ed.2d at 385-386.

I believe that this case was remanded to us by the United States Supreme Court because this Court, like Arizona in Edwards, had focused on the voluntariness of petitioner's confession rather than on whether he understood his right to counsel and intelligently and knowingly relinquished it. The majority opinion does nothing to refocus its inquiry, and to shed light on the question for which the case is returned to us by the United States Supreme Court.

The majority base their opinion largely on the findings of fact and conclusions of law of the trial court in its order denying the suppression of Blakney's confessions. The majority opinion makes no mention of the two glaring flaws in those findings of fact and conclusions of law that were

-16-

emphasized in the two dissents to the original opinion. See 605 P.2d at 1101-1107. We said in those dissents that the findings were flawed because the District Court applied the burden of proof to Blakney instead of to the State and that this was erroneous. The majority opinion in the first case concluded that the court had indeed applied the wrong rule for burden of proof, but held this to be harmless error. In a legal sense "harmless error" is a black hole in which all matter is at one, and from which no light can be seen.

The other flaw in the trial court's findings and conclusions is that after the hearing on the motion to suppress, the trial court entered an order denying the suppression. It was following this that an intern working with the county attorney in the case suggested that findings of fact and conclusions of law would be proper. The trial court's findings and conclusions were entirely prepared by the county attorney, and were entered ex post facto the order denying suppression.

I firmly contend the State failed in its burden of proof to show that Blakney understood his right to counsel and intelligently and knowingly relinquished it, as required under Edwards. A review of the record will show why.

The witnesses in the suppression hearing were placed under the rule and so did not hear each other testify. At the critical time of the request made by Blakney for an attorney, those present were Officers Ibsen and Weaver and Blakney himself.

Officer Ibsen was the first to testify at the suppression hearing. His testimony was (1) Blakney made a request for an attorney after he had first confessed to the act, (2)

Blakney did not ask for an attorney before the entire confession had been obtained, and (3) Ibsen was positive of these facts.

> "Q.   [Blakney's counsel]  Before he made any statement, did he at all attempt to assert his rights to obtain an attorney?  A.  [Ibsen]  At one point, I'm not sure if it was -- I believe it was after the first time he had given his confession -- he said that he thought he wanted an attorney.
>
> "Q.  Now, you think it was after the first time. Are you sure?  A.  It was after the first confession or during -- in the middle of it.
>
> ". . .
>
> "Q.  What I'm interested in finding out from your testimony is when Larry stated that he thinks he better see a lawyer.  Are you absolutely sure in your mind that it was after he made his confession, or was it right at the start of it?  A.  It was after he had started to make his confession, and it may have been, there, too, between the first time and the second time he made that confession.
>
> ". . .
>
> "Q.  But you are positive that it was after the first confession?  A.  After the first confession was started, or towards the end of it.
>
> "Q.  What do you mean by 'started'?  A.  After he was well into it."

Officer Weaver was called to the stand, and his testimony was to the effect (1) that Blakney did <u>not</u> ask for a lawyer, and (2) whatever statement he made was <u>before</u> any confession by Blakney.

> "Q.  [Blakney's counsel]  At any time subsequent to completing the polygraph examination, did Larry make a statement to the effect that 'Maybe I should see a lawyer'?  A.  He made a statement similar to that.
>
> "Q.  At that time, did you continue questioning, or did you cease?  A.  Larry continued to talk.
>
> "Q.  Did you allow Larry to leave the room and make a phone call for an attorney?  A.  He did not ask to.
>
> "Q.  Did he ask you if he could go talk to his uncle or did you allow him to leave the room and talk to his uncle?  A.  I didn't deny him.

-18-

"Q.  Did you stop your questioning at that point?  A.  At what point?

"Q.  When he said, 'I think I'd better see a lawyer.'  A.  I stopped questioning, yes.

"Q.  And yet, subsequent to that, he made a statement; is that correct?  A.  Would you say it again, sir?

"Q.  Okay.  Larry stated, 'Maybe I should see a lawyer,' and you stopped questioning, but, yet, you are saying that he made a statement after that?  A.  He did not make -- he did not ask for an attorney.

"Q.  But he said, 'Maybe I should see one'?  A.  Yes.

"Q.  And you didn't get him one?  A.  He did not ask for one, sir.

"Q.  That's not my question, whether or not he asked for one.  I'm asking you did you get him a lawyer after he said, 'Maybe I should see a lawyer'?  A.  No, sir.

". . .

"Q.  At what point in time was this request or assertion made?  A.  I do not recall the exact incident or the exact way it was phrased, and so, that means I don't recall when it was made in the interview.

"Q.  So, then, it could have been made before a statement was given?  A.  Yes.  I'm sure it was.

"Q.  You are sure it was made?  A.  I'm sure of that, yes."  (Emphasis added.)

Blakney was the next to testify.  His testimony was (1) he had asked for a lawyer, (2) it was before he had given any statement, and (3) the police just kept talking.

"Q.  Then where did the polygraph operator go?  A.  Then, he left the room.

"Q.  Who was in the room with you then?  A.  Ibsen and Weaver came in.

"Q.  Then what happened?  A.  They started, you know, chumming up to me, and they was saying that, you know, 'Come on, Larry.  We know you did it.  You've got to tell us.'

"Q.  At this time, did you say anything about your constitutional rights?  A.  Well, I said, 'Well, I think I better talk to a lawyer.'

-19-

"Q. Was this before you had given them any statement? A. Yes.

"Q. What did the police do? A. Just kept talking.

"Q. What did you think that meant? A. That they wasn't going to get me a lawyer.

"Q. Did you think there was any reason to ask them again? A. Well, I already asked them, you know, and I didn't want to push anything."

When the State then presented its case in the suppression hearing, the county attorney recalled Officer Ibsen. At this time, Officer Ibsen (1) repeated that there was request for the attorney, (2) weakened his testimony as to whether it was before the confession had been given, and (3) stated that Blakney said he didn't want an attorney, (4) after a statement made by Officer Weaver but not testified to by Weaver.

"Q. [County attorney] Officer, was there any mention of this first word about an attorney again that night at all? A. [Ibsen] Yes, sir.

"Q. And when did that occur? A. That occurred a matter of seconds after Mr. Blakney started talking again.

"Q. What was it that he said? A. It was not about -- it was not a mention of an attorney that he said, but it was by Officer Weaver.

"Q. Officer Weaver said something about an attorney? A. Yes, sir. He did.

"Q. And what did Officer Weaver say? A. He stopped Mr. Blakney and he advised him that he had just said he thought he wanted an attorney and, you know, he indicated that since he had said that, why was he talking again?

"Q. And what was Mr. Blakney's response to that? A. Mr. Blakney's reply -- again, it is not a quote. The best of my recollection, the wording of it, 'I don't need one' or 'I don't want one.'

"Q. And then what happened? A. Then he continued on."

The State recalled Officer Weaver again to the stand. By way of explanation, to this point, the evidence in the record indicates that Blakney's request for an attorney had

-20-

been made on Monday night, following his polygraph examination. Weaver, on recall, testified (1) that a request had been made by the attorney on <u>Sunday</u> morning, and (2) that <u>another</u> request was made on Monday night but he could not recall the events so as to confirm what Ibsen had testified about that request.

"Q. [County attorney] Officer, do you recall, at any time during the course of your dealings with Mr. Blakney, whether he said anything about an attorney? A. Yes, sir.

"Q. And can you tell us what happened or what was said? A. At one point in the interview, the Defendant asked me if -- something to the point -- I don't remember the exact words, but the gist of it was, 'If you think I did it, then maybe I should talk to an attorney.'

"Q. What was your response to this? A. At this time, I got up from where I was sitting, I stood up. I told Larry that -- I says, 'I don't know what happened, but I believe that you possess some information, and that's what I'm after.' If he wanted an attorney, that was his decision, and we would abide by it.

"Q. And what happened after that? A. He just started talking again about what we were asking him questions regarding to.

"Q. Now, when did this particular event occur? A. It occurred about midway through the second interview.

"Q. This would be the interview on Sunday morning? A. Yes.

"Q. Did you have the occasion to talk to the Defendant again where there was anything like that that you can recall? A. I remember the event occurring about the same way on Monday night, but I do not remember the particulars of what happened, like I do the Sunday morning conversation.

"Q. Do you remember anything at all about it? A. All I can remember is that we did stop and the conversation proceeded something as the order of the first one.

"Q. But you don't recall the exact words that were said? A. No, sir.

On cross-examination, Weaver continued:

"Q. [Blakney's counsel] Were there any other interviews on Sunday? A. No.

"Q.   So he did mention an attorney?   A.   Yes.

"Q.   Now, I think you said that Larry said something to the effect that, 'If you think I did it, maybe I should see an attorney.'   Is that your statement?   A.   Yes.

"Q.   And then, what did you do following that statement?   A.   As I indicated earlier, I got up from where I was seated, and as I remember, he wanted to know what I thought in this same general area that we are talking about, here.

"Q.   About whether he should see an attorney? A.   Yes, and what I thought, you know, whether I thought he had done something.   And I told him it was his decision, that I was just after some information that I thought he possessed.

"Q.   At that point in time, was he a suspect in your eyes?   A.   No, sir.

". . .

"Q.   But he did make a request or a mention of an attorney on the Sunday morning interview? A.   No request; just a mention, sir.

"Q.   Do you remember testifying in this Courtroom on Tuesday?   A.   Yes, sir.

"Q.   About the Monday night incident?   A.   Yes, sir.

"Q.   Do you remember me asking you if, on Monday night, Larry made a mention or request for an attorney?   A.   As I recall -- I am not sure, but as I recall, I referred that incident to the second interview.

"Q.   I think that I asked you if, after the polygraph examination, Larry made a reference to an attorney, and you said, 'Yes.'   And I said, 'Was that before the first statement was taken?'   And you said, 'Yes.'

"[County attorney]   Your Honor, I'll object on the grounds that this would be proven by the record, and the Court, of course, has heard the testimony, so I think that the question is argumentative.

"THE COURT:   Sustained.

"[Blakney's counsel]   Your Honor, if I could address that, this is cross examination, and there appears to be a material conflict in this witness's testimony.   We have been recessed for this particular witness over a weekend.   Apparently, he has talked to the County Attorney's office. It's a possible conspiracy, here, to violate this man's constitutional rights, and I think that

-22-

leeway should be granted to find out just what happened.

"THE COURT:  I have ruled, and when I want argument, I'll ask for it.  Your next question.

"Q.  [Blakney's counsel]  You don't recall making the statement on Tuesday, then, that the mention of an attorney was before the first statement was taken?  A.  As I remember my Tuesday testimony, when I referred to the question of an attorney and I gave my explanation as I did today, I was referring to the second statement taken.

"Q.  And not to the Monday night incident?  A. No.  As I testified here today, I remember the Monday night occurrence, but not -- I didn't relate to it.

"Q.  Is your testimony, then, that you remember what occurred Monday night after the polygraph examination?  A.  Pardon me, sir?

"Q.  Do you remember what happened after the polygraph on Monday?  A.  Yes, sir.

"Q.  And do you remember -- I think you mentioned on direct examination that you don't recall the exact words that were used by Larry in reference to an attorney; is that correct?  A.  On Monday night, I do not.

"Q.  But now, you are saying that the request or mention came some time after the first statement was started?  A.  I recall the incident of what the conversation was saying during the second statement, and not the Monday night statement.

". . .

"Q.  Do you recall at this time whether or not, on Monday night, Larry made mention of an attorney either before the first statement began, during the first statement, or some time after?  A.  On Monday night?

"Q.  Yes.  A.  I recall an incident occurring; I do not recall what occurred.

"Q.  Do you recall when it occurred?  A.  It occurred while we were talking to Larry.

"Q.  Before or after a statement was given?  A. I do not recall when it was given."

Blakney was recalled to the stand respecting the

Sunday morning incident testified to by Weaver and testified:

"[County attorney]  Mr. Volinkaty asked you something about some attorney on a Sunday

-23-

morning interview, and you said something about something -- something an attorney. A. On Sunday?

"Q. Yes, Sunday morning. The one between -- oh, I don't know -- nine and twelve which Officer Weaver testified about. A. That I asked for an attorney?

"Q. Yes. A. No, I didn't.

"Q. You didn't ask for an attorney? A. Not on Sunday. I asked on Monday.

"Q. So what Officer Weaver testified about wasn't true, in your opinion? A. No, it wasn't."

Based on that testimony, I determine that the findings of the trial court were clearly erroneous. I find it incredible that Blakney requested counsel at the Sunday morning interview, when he was not apparently under suspicion for the crime. I find it incredible that he said he "didn't want an attorney" at the Monday night interview, when the person to whom it is claimed he made that statement has no recollection of it at all. I further believe that when Blakney stated he wanted an attorney, he was cajoled by the interrogating officer that all they wanted was "some information that he possessed."

A further indication of the unreliability of the trial court's findings is no. 6, which stated that "a tape recording of the defendant's polygraph examination clearly indicates that the defendant was not threatened or intimidated by the procedures used." There was no tape recording of that particular examination.

The State failed in its burden to show that Blakney intelligently and knowingly relinquished his right to counsel, or that he understood his right to counsel. Under Edwards, I would vacate his conviction, and remand with instructions to suppress the evidence of his confessions.

_____
Justice

-24-

Mr. Justice Daniel J. Shea and Mr. Justice Frank B. Morrison, Jr.,
concur in the foregoing dissent.

_____
_____
                    Justices