No. 98-682

IN THE SUPREME COURT OF THE STATE OF MONTANA

2000 MT 329

303 Mont. 60

15 P. 3d 408

STATE OF MONTANA,

Plaintiff and Respondent,

v.

BRIAN PAUL SIMMONS,

Defendant and Appellant.

APPEAL FROM: District Court of the Thirteenth Judicial District,

In and for the County of Stillwater,

Honorable G. Todd Baugh, Judge Presiding

COUNSEL OF RECORD:

For Appellant:

Gary R. Thomas, Thomas Law Office, Red Lodge, Montana

For Respondent:

Honorable Joseph P. Mazurek, Attorney General; Brenda Nordlund,

Assistant Attorney General, Helena, Montana

Robert Eddleman, County Attorney, Columbus, Montana

Submitted on Briefs: June 15, 2000
Decided: December 14, 2000

Filed:

_____

Clerk

Chief Justice J. A. Turnage delivered the Opinion of the Court.

¶1 Brian Paul Simmons pled guilty to driving under the influence (DUI), reserving his right to appeal the denial of his motion to suppress evidence on two grounds. We affirm the decision of the Thirteenth Judicial District Court, Stillwater County.

¶2 The issues are:

¶3 1. Did the District Court err in denying Simmons' motion to suppress the results of his breath test on grounds that prior to taking the test Simmons was provided erroneous and misleading information as to the ramifications of his taking or not taking the test?

¶4 2. Did the court err in denying Simmons' motion to suppress his answers to questions on grounds that he had stated his wish to have an attorney present?

¶5 Simmons was arrested for DUI on Highway 78 in Stillwater County, Montana, during the early morning hours of December 29, 1995. Following his arrest, he was taken to the Stillwater County Sheriff's Office, where an audiovisual tape was made of the proceedings.

¶6 Police Officer Donald Hardesty, of Columbus, Montana, read Simmons the Montana Implied Consent Advisory concerning the administration of testing to determine the level of alcohol in the blood. Among other things, this form states:

> (2) If you refuse this testing, your driver's license will be seized and suspended for six months.

> (3) If you have refused similar testing within the past five years and you refuse

again today, your driver's license will be seized and revoked for one year.

(4) You will not be eligible for a probationary driver's license during the suspension or revocation.

After reading Simmons the Implied Consent Advisory, Officer Hardesty requested a breath sample and Simmons complied.

¶7 Officer Hardesty then read Simmons his Miranda warnings from another form. At the end, he read a series of three questions from the form. The first question was, "Do you understand each of these rights I have explained to you?" Simmons answered, "Yes, sir." The second question was, "Having these rights in mind, do you wish to talk to me now?" Simmons replied, "Sure." The officer asked, "That's a yes, right?" and Simmons replied, "Yes." The third question was, "Do you wish to have an attorney present?" Simmons first replied, "What am I being charged with?" to which Officer Hardesty responded, "I'm not sure all the charges, but this is in reference to driving under the influence of alcohol." Simmons then said, "Okay, yes." Officer Hardesty marked on the Miranda form that Simmons answered "Yes" to the question, "Do you wish to have an attorney present?" At that point, the following exchange occurred:

Officer Hardesty: Okay, Brian, could you come up here and see if I wrote down the things that you said, and if I checked the ones that you answered, please sign here. I asked you do you wish to have an attorney present. Do you want an attorney present or no?

Simmons: I do not wish to have an attorney present just for this part, no.

Officer Hardesty: So you do not wish to have an attorney present?

Simmons: No, not at this point.

Officer Hardesty: So, I am going to change this because you said "yes" before. So, I am going to change it. Okay, so you can see my change, "Do you wish to have an attorney present? No." Is that correct?

Simmons: Okay.

Officer Hardesty then interrogated Simmons, asking him among other questions,

"Have you been drinking?" to which Simmons answered "yes."

¶8 In two separate motions to suppress, Simmons argued that his consent to the breath test was invalid and that his answers to questions after he was given the Miranda warnings should be suppressed. The District Court denied both motions. Simmons later pled guilty, reserving his right to appeal the denial of his motions to suppress.

## Standard of Review

¶9 This Court reviews a district court's denial of a motion to suppress to determine whether the court's findings of fact are clearly erroneous and whether those findings were correctly applied as a matter of law. *State v. Anderson*, 1999 MT 60, ¶ 7, 293 Mont. 490, ¶ 7, 977 P.2d 983, ¶ 7. The issue of whether a defendant's due process rights were violated is a question of law. This Court's standard of review of a conclusion of law is whether the district court's interpretation of the law was correct. *State v. Strand* (1997), 286 Mont. 122, 124, 951 P.2d 552, 553. As to whether Simmons waived his right to have an attorney present before he answered the officer's questions, once Simmons made a prima facie showing that the evidence was illegally obtained, the prosecution bore the burden of establishing that the evidence was lawfully obtained. *State v. Blakney* (1979), 185 Mont. 470, 481, 605 P.2d 1093, 1098, *cert. granted* 451 U.S. 1013, 101 S.Ct. 2999, 69 L.Ed.2d 384 (1981), *aff'd on remand*, 197 Mont. 131, 641 P.2d 1045 (1982).

## Issue 1

¶10 Did the District Court err in denying Simmons' motion to suppress the results of his breath test on grounds that prior to taking the test Simmons was provided erroneous and misleading information as to the ramifications of his taking or not taking the test?

¶11 Simmons contends that as a Nevada resident with a Nevada driver's license, the information he was given about the consequences of refusing testing was "completely erroneous and misleading" because "the State of Montana has no authority to seize or suspend [his] Nevada driver's license." Simmons submits that his due process rights were violated when he was given incorrect information on the consequences of a refusal to submit to a breath test.

¶12 Simmons cites a line of Georgia cases under which it appears that if this case had arisen in that state, he would prevail on this argument. In the most recent of those cases, a

Georgia appeals court held that informing holders of out-of-state driver's licenses that they will lose driving privileges if they refuse a blood alcohol test constitutes misinformation which justifies excluding from evidence any subsequent breath test results. *State v. Coleman* (Ga.App. 1995), 455 S.E.2d 604. The Georgia court held that such drivers must be informed that the penalty for refusing a blood alcohol test is that they will lose their privilege to drive "at least on the highways of this state." *Coleman*, 455 S.E.2d at 605.

¶13 A three-judge minority of the Georgia court, whose reasoning we find persuasive, disagreed:

> There is no question that Officer Michael Saunders properly advised defendant . . . pursuant to the relevant portion of Georgia's Implied Consent law, . . . that "you will lose your privilege to operate a motor vehicle from six to twelve months should you refuse to submit to the designated State administered chemical test." However, the majority says this admonition is not enough for non-residents suspected of drunk driving in Georgia because it fails to inform them that Georgia does not have the power to "absolutely suspend or revoke a nonresident's driver's license . . . ." In other words, the majority steps beyond the basic admonitions prescribed by the legislature . . . , further requiring police officers to give non-residents advice regarding possible diminished risks of losing their out-of-state driving privileges for failing to submit to one of the chemical tests required by OCGA § 40-5-55(a). This is not practical.
>
> Police officers are not lawyers and they are not required to engage in such legal speculation. "The moment we add a requirement to the statute that the arresting officer make a verbal explanation and interpretation of the rights of an arrested person under the implied consent law, others will contend that the officer's explanation served to obfuscate rather than elucidate." Massaro v. Dolan, 535 P.2d 1135, 1136 (Colo. App. 1975). For this reason alone, I do not think it is wise to require an arresting officer to make any comments concerning a drunk driving suspect's legal rights outside the requirements legislatively prescribed under Georgia's Implied Consent law. Further, I do not believe the defendant in the case sub judice was misinformed and thereby unlawfully coerced into submitting to a state-administered test for the presence of alcohol in his blood. On the contrary, it is my view that the general admonition Officer Saunders gave defendant was an accurate statement of law which not only apprised defendant that his driving privileges would be revoked in Georgia, but also placed defendant on notice that his

driving privileges would be revoked or suspended to the fullest extent provided by law. From this perspective, it becomes apparent that the premise projected in the majority opinion (i.e., Georgia has no power to effect suspension of defendants' out-of-state driver's license) is wrong.

OCGA § 40-5-51(c) requires the Georgia Department of Public Safety to forward a certified copy of the record reflecting revocation of defendant's driving privileges to defendant's home state, North Carolina. North Carolina's Uniform Driver's License Act provides for suspension of the license of any driver who "[h]as committed an offense in another state, which if committed in [the] State [of North Carolina] would be grounds for suspension or revocation. . . ." Like Georgia, North Carolina's Implied Consent statute provides that "[r]efusal to take any required test or tests will result in an immediate revocation of [a person's] driving privilege . . . ." In my view, the State of Georgia is empowered to effect suspension of defendant's North Carolina driver's license and that Officer Saunders' warning to defendant (i.e., "you will lose your privilege to operate a motor vehicle . . . should you refuse to submit to the designated State administered chemical test") was an accurate assessment of Georgia's power to effect suspension of defendant's driver's license. Consequently, I cannot agree with the majority's conclusion that defendant was "misinformed regarding the consequence of his failure to submit to the test, and [that] such misinformation constituted unlawful coercion."

*Coleman, 455 S.E.2d at 600-02 (citations omitted).*

¶14 Under Montana law, a person who operates or is in actual physical control of a motor vehicle upon the ways of this state is considered to have given consent to a test of the person's blood or breath for purposes of determining the presence of alcohol or drugs in the body. Section 61-8-402(1), MCA. If a testing request is refused, the law allows the investigating officer to "seize the person's driver's license . . . [and] forward [it] to the [D]epartment [of Justice]" along with a report stating the basis for the testing request and the fact of refusal. Section 61-8-402(4), MCA. Upon receipt of the report, the Department is authorized to suspend the license for six months if it is a first refusal or to revoke the license for one year if it is a second or subsequent refusal within five years. Section 61-8-402(6), MCA.

¶15 Additionally, the Department is authorized to suspend or revoke nonresident driving privileges "in like manner and for like causes as a driver's license issued under this

chapter." Section 61-5-203, MCA. The Department must forward a driver's license seized from a nonresident, along with a report of the testing refusal, to the licensing authority of the nonresident's home state. Section 61-8-402(7), MCA.

¶16 By statutory definition, the term "driver's license" includes "any nonresident's driving privilege." Section 61-1-136(3), MCA. We conclude that the advisory read to Simmons was therefore technically correct in informing him that his "driver's license will be seized and suspended."

¶17 Montana's implied consent statutes do not specifically require an officer to provide information to an arrested motorist as to the ramifications of refusal to take the requested test. In fact, a driver is not entitled to be informed that he or she may refuse the test. *State v. Purdie* (1984), 209 Mont. 352, 356, 680 P.2d 576, 579, *overruled on other grounds, Hulse v. State, Dept. of Justice, Motor Vehicle Div.*, 1998 MT 108, 289 Mont. 1, 961 P.2d 75. The purpose of the Implied Consent Advisory is to inform an apparently intoxicated driver of the potentially serious consequences of refusing to submit to a blood alcohol test and of his due process protections such as rights to independent testing and post-testing hearings. Those purposes were accomplished here.

¶18 We conclude that Simmons was provided with sufficiently accurate information as to the ramifications of a refusal to submit to testing. We further conclude that the advisory form was not erroneous nor did it affirmatively mislead Simmons. We affirm the District Court's denial of Simmons' motion to suppress.

Issue 2

¶19 Did the court err in denying Simmons' motion to suppress his answers to questions on grounds that he had stated his wish to have an attorney present?

¶20 Simmons contends that his initial response to the question of whether he wished to have an attorney present was "yes," and that all questioning of him should have then stopped, under *Edwards v. Arizona* (1981), 451 U.S. 477, 101 S.Ct. 1880, 69 L.Ed.2d 378. He challenges in particular the District Court's finding that when he answered "Okay, yes," what he really meant was that he did not want an attorney present. He asserts that the only possible substantial evidence in support of that finding is found in his responses to continued questioning.

¶21 We begin our consideration of this issue by placing the *Edwards* rule in context. Before the "no further questioning" rule comes into play, a determination must first be made as to whether the accused has actually invoked his right to counsel.

Although a suspect need not "speak with the discrimination of an Oxford don," he must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney. If the statement fails to meet the requisite level of clarity, *Edwards* does not require that the officers stop questioning the suspect.

*Davis v. United States* (1994), 512 U.S. 452, 459, 114 S.Ct. 2350, 2355, 129 L.Ed.2d 362, 371 *(citation omitted)*.

¶22 Here, the District Court was convinced that Simmons never invoked his right to counsel, because his initial responses to questions on whether he wished to do so were sufficiently ambiguous to warrant further inquiry. After reviewing the audiovisual tape of Simmons' interview, the District Court concluded that the State had proven by a preponderance of the evidence that Simmons was advised of his right to counsel and that he knowingly and voluntarily waived it. Analyzing the dialogue between Officer Hardesty and Simmons as recorded on the tape, the court concluded that Simmons' "Okay, yes" reply did not constitute an invocation of the right to counsel. The court reasoned that the "Okay, yes" reply "most likely signified [Simmons'] continued agreement with what had been said up to that point"-namely, that Simmons was willing to talk to the officer.

¶23 After reviewing the record and viewing Simmons' answers in context, we agree. Simmons' prior comments, particularly his answer that, yes, he did wish to talk to the officer now, support the finding that what Simmons meant by "Okay, yes" was that he was willing to talk to the officer without an attorney present.

¶24 The District Court's findings are supported by substantial credible evidence and are not otherwise clearly erroneous. The court's conclusions are correct as a matter of law. We agree with the District Court that the State established by a preponderance of the evidence that Simmons waived his right to counsel. We therefore affirm the court's denial of Simmons' motion to suppress on this ground.

¶25 Affirmed.

/S/ J. A. TURNAGE

We concur:

/S/ KARLA M. GRAY

/S/ JAMES C. NELSON

/S/ W. WILLIAM LEAPHART

Justice Terry N. Trieweiler concurring and dissenting.

¶26 I concur with the majority's resolution of Issue 2. I agree that based on the totality of his remarks the Defendant waived his right to counsel.

¶27 I dissent from the majority's conclusion that the Defendant was not misinformed about the consequences of refusing to submit to testing for the level of alcohol in his blood.

¶28 Simmons was advised in Montana by a Montana law enforcement officer, that if he refused to submit to testing, his driver's license would be suspended for a minimum of six months and that he would not be eligible for a probationary driver's license during the suspension or revocation. Neither of these admonitions were correct. Montana had no authority to suspend his license, nor is there evidence that Nevada will suspend it under the circumstances of this case. Simmons was misinformed about the consequences of declining to be tested. I agree with the decision in *Deckard v. Georgia* (Ga. Ct. App. 1993), 436 S.E.2d 536, that consent based on misinformation is no different than coercion and that evidence obtained as a result of coercion must necessarily be suppressed.

¶29 As applied to a driver licensed in a state other than Montana, the Montana Department of Justice Implied Consent Advisory Form which was read to Simmons is incorrect. It advises an out-of-state driver that refusal to submit to a test for measurement of blood alcohol level will result in seizure and suspension of that person's license. In fact, Montana has no authority to suspend an out-of-state driver's license. Section 61-8-402(7), MCA, provides that in the event a nonresident driver refuses to submit to testing that person's license may be seized, but then must be sent to the licensing authority of that person's home state. Section 61-5-203, MCA, provides only that a nonresident's driving privileges within Montana can be suspended. There are no other sanctions provided pursuant to Montana law for refusal of a nonresident driver to submit to blood-alcohol testing.

¶30 The fact that "driver's license" is broadly defined pursuant to § 61-1-136(3) to include a nonresident's driving privileges makes no difference under the circumstances. A nonresident driver would not be aware when advised that his or her "driver's license" will be seized that the investigating officer is actually talking about driving privileges within the State of Montana. This is especially true when the driver is also advised that he or she will not be eligible for a probationary driver's license

during the suspension or revocation. The out-of-state driver is still misled, as a practical matter, and his or her consent is induced by that misimpression of the consequences of refusal. The issue is whether someone who submits or refuses to submit to a test for blood-alcohol level has been misled. It is disingenuous to suggest that the suspect is not misled because of a broad statutory definition of "driver's license" about which the out-of-state driver knows nothing.

¶31 The majority's reliance on the dissenting opinion from the intermediate appellate court in the State of Georgia in *State v. Coleman* (Ga. Ct. App. 1995), 455 S.E.2d 604, is especially troubling. The opinion is poorly reasoned and based on factual assumptions which are not true in this case.

¶32 First, the author of the dissenting opinion in *Coleman* was concerned that requiring law enforcement officers to correctly advise out-of-state drivers would be an unreasonable burden and require that they engage in "legal speculation." That is not correct. In fact, the Implied Consent Advisory Form used in Montana from 1991 to 1995 correctly advised out-of-state motorists as follows:

3(b) Upon receipt of the sworn statement [that the motorist refused to take the request test], the Motor Vehicle Division shall suspend your driver's license *and/or driving privilege* for 90 days upon a first refusal; or shall revoke your license *and/or driving privilege* for one (1) year upon a second or subsequent refusal within a five (5) year period. In either case, no provisional or probationary license may be issued.

(c) If you are a nonresident, your *privilege to operate a motor vehicle in Montana* will be suspended or revoked, and your seized license and a copy of the affidavit will be sent to your home state.

(Emphasis added.)

¶33 The previous Implied Consent Advisory Form was completely accurate, there was nothing about it that made the investigating officer's job more difficult and it required no "legal speculation." The former language should still be required if consent is to be honestly and fairly obtained.

¶34 Second, the author of the dissent in *Coleman* concluded that the out-of-state driver in that case had not been misinformed because the driver's home state, North Carolina, would have suspended his license upon notification from the State of Georgia. There is no evidence in this record that Simmons' home state, Nevada, would have similarly suspended his license for refusal to submit to a blood-alcohol test in Montana. In fact, Simmons contends that Nevada would not have suspended his license.

¶35 Finally, it is inappropriate for the majority to suggest that Montana law does not require an officer to provide information to an arrested motorist regarding the consequences of refusal to submit to a test of his or her blood alcohol level. Nor is it appropriate for the Court to suggest that a driver is not entitled to be informed that he or she may refuse the test. Neither of these issues were presented to the Court in this case. Neither party has briefed either issue. This Court did not vote on that issue when this case was submitted. The language first appeared in the proposed opinion without any prior discussion. It should

be noted by those who rely on this Court's opinions for future guidance that because the two statements have nothing to do with the ultimate issues in this case, they are pure dicta.

¶36 For these reasons, I concur with the majority's disposition of Issue 2 and dissent from the majority's resolution of Issue 1.

/S/ TERRY N. TRIEWEILER