DA 09-0475

IN THE SUPREME COURT OF THE STATE OF MONTANA

2011 MT 123

STATE OF MONTANA,

  Plaintiff and Appellee,

 v.

JAMES JOSEPH MAIN, JR.

  Defendant and Appellant.

APPEAL FROM: District Court of the Twelfth Judicial District,
       In and For the County of Hill, Cause No. DC 06-163
       Honorable E. Wayne Phillips, Presiding Judge

COUNSEL OF RECORD:

  For Appellant:

  Robin Amber Meguire, Attorney at Law; Great Falls, Montana

  For Appellee:

  Steve Bullock, Montana Attorney General; John A. Paulson, Assistant
  Attorney General; Helena, Montana

  Dan Guzynski, Barbara Harris, Assistant Attorneys General, Special
  Deputy County Attorneys for Hill County; Helena, Montana

  Gina Dahl, Hill County Attorney; Havre, Montana

Submitted on Briefs: February 16, 2011

Decided: June 7, 2011

Filed:

_____
Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1 James Main, Jr., (Main) appeals from the judgment and conviction for deliberate homicide, felony murder, entered following jury trial in the Twelfth Judicial District Court, Hill County. We affirm. We address the following issues:

¶2 *I. Did the District Court err by denying Main's motion to suppress?*

¶3 *II. Did the District Court err by denying Main's motion to dismiss for insufficient evidence at the close of the State's case-in-chief?*

¶4 *III. Was Main denied effective assistance of counsel?*

### FACTUAL AND PROCEDURAL BACKGROUND

¶5 On November 25, 2006, around 1:20 a.m., police officers were dispatched to Mellissa Snow's (Snow) residence in Havre, Montana in response to a report of a possible deceased male. At the scene, emergency personnel advised law enforcement that the victim, Lloyd or "Lucky" Kvelstad ("Lucky" or "Kvelstad"), was dead. Officer testimony indicated that Kvelstad's face was severely beaten and covered in blood, his pants were down around his ankles, and a ligature made from a hooded sweatshirt (hoodie) string was around his neck.

¶6 Trial testimony provided the following sequence of events. Kim Norquay, Jr. (Norquay) arrived at Snow's residence in the morning on November 24, and Main arrived "towards evening." Joseph Red Elk (Red Elk) and Jason Skidmore (Skidmore) arrived around 9 or 10 p.m. When Red Elk and Skidmore arrived, Billy the Boy (Billy), Snow, Norquay, Kvelstad, and Main were all at Snow's residence "drinking and visiting."

2

Snow testified that everyone was drunk. After a discussion about Pilgrims and Thanksgiving, Kvelstad, a non-Native American, was verbally and physically assaulted. Main and Skidmore "choked out" Kvelstad several times until he lost consciousness, but Kvelstad regained consciousness each time. Norquay slapped Kvelstad's face a few times, and simulated a sexual assault on Kvelstad. Red Elk overheard Main and Norquay discuss killing Kvelstad. Eventually, Kvelstad "passed out sleeping" and Snow and Skidmore carried Kvelstad to the bedroom. Red Elk and Skidmore left Snow's house around 11 p.m. Red Elk testified that, when he left the house, Kvelstad was alive and not bloody.

¶7 Nathan Oats (Oats), Georgetta Oats (Georgetta), and Ivy Snow (Ivy) arrived at Snow's residence a few hours later. Upon entering the living room, Oats saw Kvelstad lying on the couch. When trying to rouse Kvelstad, Oats discovered Kvelstad was unresponsive and severely beaten. Oats told Georgetta to call the police. When Georgetta announced that police were coming, Norquay fled and Main attempted to leave. Oats restrained Main from leaving, and they scuffled. Upon their arrival, Officers Jason Barkus (Barkus), Dan Waldron (Waldron), Larry Virts (Virts) and Sergeant Bill Wilkinson, Jr. (Wilkinson) noticed that Ivy, Georgetta, Oats, Billy, Snow, and Main were in the residence. Wilkinson directed that witnesses be separated and detained for questioning. The officers also located and detained Norquay, Red Elk, and Skidmore for questioning. Waldron transported Main to the police department and conversed with him

3

until Main was interviewed by Assistant Chief of Police George Tate (Tate). Tate interviewed Main three times over the next day and a half.

¶8 Main was charged with Deliberate Homicide in violation of § 45-5-102(1)(a), MCA (2005)[1] or, alternatively, Deliberate Homicide by felony murder in violation of § 45-5-102(1)(b), MCA. The State subsequently moved to dismiss the primary charge, leaving deliberate homicide by felony murder as the remaining charge, which the District Court granted. Norquay was also charged and convicted of deliberate homicide, felony murder, in Kvelstad's death, and of tampering with physical evidence. His convictions were affirmed by this Court. *State v. Norquay*, 2011 MT 34, 359 Mont. 257, 248 P.3d 817. Snow testified that she was charged with, and pled guilty to, tampering with physical evidence for her role in cleaning up blood at the scene.

¶9 Main moved to suppress statements he made to Waldron and Tate. The District Court granted the motion with respect to Main's statements to Waldron, but denied the motion as to the statements made to Tate.

¶10 Trial by jury was conducted in February 2009. The witnesses included Snow and Norquay, who testified under grants of judicial immunity. Prior to opening statements, the parties executed a stipulation, which was read to the jury, indicating that Norquay had been "found guilty of being accountable for the deliberate homicide of Lloyd Kvelstad."

---

[1] All statutory references are to the 2005 MCA, unless otherwise indicated.

4

At the conclusion of the State's case-in-chief, Main moved for a judgment of acquittal[2] on the ground of insufficient evidence, which was denied. Main was found guilty of Deliberate Homicide, felony murder, and was subsequently sentenced to the Montana State Prison for sixty years. Main appeals. Additional facts as necessary will be discussed herein.

## DISCUSSION

¶11 ***I. Did the District Court err by denying Main's motion to suppress?***

¶12 "We review a district court's decision to grant or deny a motion to suppress to determine whether the court's underlying findings of fact are clearly erroneous and whether the court correctly interpreted and applied the law to those findings." *State v. Gittens*, 2008 MT 55, ¶ 9, 341 Mont. 450, 178 P.3d 91 (citing *State v. Lewis*, 2007 MT 295, ¶ 17, 340 Mont. 10, 171 P.3d 731).

¶13 After Waldron took Main to the police department, they had what the District Court described as a "conversation" lasting about eighty minutes while waiting for Tate to speak with Main. At around 3:00 or 4:00 a.m., Tate interviewed Main after obtaining Main's *Miranda* waiver. Main denied having any involvement in Kvelstad's death. Later that day, Tate conducted a second interview with Main after Main again waived his *Miranda* rights. Main continued to deny that he fought with Kvelstad or had any involvement with Kvelstad's death. Later in the interview, Main invoked his right to an

---

[2] The proper motion is "to dismiss for insufficient evidence." *See State v. McWilliams*, 2008 MT 59, ¶ 36, 341 Mont. 517, 178 P.3d 121. We will refer to Main's motion as a motion to dismiss for insufficient evidence.

5

attorney. Tate ended the interview, and arrested Main. The next afternoon, Main initiated contact with Tate. Tate again obtained Main's *Miranda* waiver and conducted a third interview. During this third interview, Main acknowledged he had fought with Kvelstad, but said that Kvelstad did not die as a result of the altercation.

¶14 Main moved to suppress his statements to Tate, arguing in part, that his *Miranda* waivers were involuntary due to his intoxicated state. He also moved for suppression of his statements to Waldron, arguing that Waldron conducted a custodial interrogation without *Miranda* warnings and that Main had made an unequivocal request for an attorney. The State responded that it would not use Main's statements to Waldron at trial, but that Main's statements to Tate should not be suppressed because Main did not unequivocally request a lawyer, Waldron did not interrogate Main, and Main voluntarily waived his right to counsel during the Tate interviews. The District Court granted Main's motion to suppress statements made to Waldron because the State did not contest the motion, but denied Main's motion as to statements made to Tate.

¶15 The 5th Amendment of the U.S. Constitution and Article II, Section 25 of the Montana Constitution provide the right against self-incrimination. *Gittens*, ¶ 12; *see also Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602 (1966). "The *Miranda* Court held that the prosecution may not use statements that stem from a custodial interrogation of a defendant unless the defendant is warned, prior to questioning, that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney." *State v. Olson*, 2003 MT 61, ¶ 13, 314

6

Mont. 402, 66 P.3d 297 (citing *Miranda*, 384 U.S. at 444, 86 S. Ct. at 1612). Once a person has invoked the right to have counsel present during custodial interrogation, the interrogation must end. *State v. Scheffer*, 2010 MT 73, ¶ 17, 355 Mont. 523, 230 P.3d 462.

¶16    Whether a suspect invokes a clear and unambiguous right to counsel is an objective inquiry. *Scheffer*, ¶ 26 (citing *Davis v. United States*, 512 U.S. 452, 458-59, 114 S. Ct. 2350, 2355 (1994)); *see also State v. Morrisey*, 2009 MT 201, ¶ 40, 351 Mont. 144, 214 P.3d 708. A suspect "must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Davis*, 512 U.S. at 459, 114 S. Ct. at 2355; *Scheffer*, ¶ 26. Invocation of a suspect's right to counsel "'requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney.'" *Davis*, 512 U.S. at 459, 114 S. Ct. at 2355 (quoting *McNeil v. Wisconsin*, 501 U.S. 171, 178, 111 S. Ct. 2204, 2209 (1991)). A request for counsel should be broadly construed and does not depend upon the use of any specific words. *State v. Lacey*, 2009 MT 62, ¶ 68, 349 Mont. 371, 204 P.3d 1192.[3]

---

[3] As we have explained, *Davis* involved a post-*Miranda* warning, or "post-waiver" invocation claim, and the U.S. Supreme Court has not yet directly addressed the standards enunciated here in the context of a "pre-waiver" invocation claim. *See Morrisey*, ¶ 39; *see also Berghuis v. Thompkins*, ___ U.S. ___, 130 S. Ct. 2250, 2275 (2010) (Sotomayor, Stevens, Ginsburg & Breyer, JJ., dissenting). However, we assumed arguendo in *Morrisey*—which involved the invocation of the right to remain silent, a right which has recently been addressed in *Berghuis*— that, similarly, "a person in custody must articulate his *pre-waiver* desire not to answer questions 'sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be' an assertion of the right . . . ." *Morrisey*, ¶ 39 (quoting *Davis*, 512 U.S. at 459, 114 S. Ct. at 2355) (emphasis added). We do the same here.

7

¶17 If a suspect's reference to counsel is ambiguous or equivocal so that, in light of the circumstances, a reasonable officer understands only that the suspect *might* be invoking his right, questioning need not cease. *Davis*, 512 U.S. at 459, 114 S. Ct. at 2355; *Scheffer*, ¶ 26. In *Davis*, the suspect's statement that "Maybe I should talk to a lawyer" was not an unambiguous request for counsel. *Davis*, 512 U.S. at 462, 114 S. Ct. at 2357; *see also Scheffer*, ¶¶ 29, 31-32 (suspect's statements "let's get my lawyer here" with other references to lawyers did not constitute an unambiguous request for counsel when viewed in light of the circumstances of the interview); *State v. Reavley*, 2003 MT 298, ¶ 33, 318 Mont. 150, 79 P.3d 270 (suspect's asking the interrogating officer if the officer thought the suspect needed an attorney was not a clear or unequivocal request for an attorney); *State v. Jones*, 2006 MT 209, ¶ 27, 333 Mont. 294, 142 P.3d 851 (suspect's statements that he was "through talking" were not an unequivocal invocation of the right to counsel). However, suspect statements that "Shit, I need a lawyer, man" and "I would like to talk to somebody" have been found sufficient to constitute requests for counsel. *Lacey*, ¶ 68; *Reavley*, ¶ 33.

¶18 Main contends he unequivocally and anticipatorily requested counsel during his conversation with Waldron, and that all subsequent statements he made should have been suppressed as "fruit of the poisonous tree," citing *Wong Sun v. United States*, 371 U.S. 471, 488, 83 S. Ct. 407, 417 (1963). The focus of Main's argument is on the following segment of the dialogue between Waldron ("DW") and Main ("JM"):

> JM: Yea, I do would like to go to sleep, go back to sleep or throw me in jail or whatever you do to me, do it

8

DW:  Well I got, why would I throw you in jail,

JM:  I don't think you should myself, questioning me for, I'm giving you the best answers I could

DW:  Yea well I'm not questioning you yet, we're just talking,

JM:  Yea

DW:  Just B-S'ing, you know before they question you they gotta read you your rights, read your Miranda,

JM: Oh, so they are gunna throw me in jail

DW:  I don't know why,

JM: I don't know, that's what you're talking about,

DW: I said if they do question you, to throw you in jail yea they gotta read you your rights

JM:  How long are you gunna keep me here then,

DW:  Well until my assistant chief tells me I can let you go, cuz it's we got a dead guy in an apartment,

. . .

DW:  No, I'm just here to trying to keep you company,

JM: Yup

DW:  Everybody in that house is

JM:  Would you let me make a phone call, it's local, it has to be local

DW:  Nope, who you gunna call at 2 in the morning?

JM:  *Call my mother to call my lawyer*

DW: Call your mom, well you'll have a chance to contact your lawyer

JM:  Yup

DW:  Right now we're just sittin here, just standin by, waiting, always waiting

(Emphasis added.)   The District Court determined that Main's request to "call [his] mother to call [his] lawyer" was not an unequivocal request for an attorney, citing *State v. Buck*, 2006 MT 81, 331 Mont. 517, 134 P.3d 53, for its analysis of a suspect's "evident purpose."   *See Buck*, ¶ 48 ("we still adhere to the rule that invocation of that right [to counsel] does not depend on the use of any particular words; rather, it depends on the evident purpose of the suspect's statement, as viewed in light of the circumstances and in light of the rule that requests for counsel must be construed broadly").   The court found

9

that the timing of Main's request (between 2-3 a.m.) to call his mother to call his lawyer was for the evident purpose of "get[ting] a hold of his mother so that, at an appropriate time of the business day, his mother can reach an attorney on his behalf." The court noted that Waldron emphasized that Main would have the opportunity to request an attorney when formally interviewed by Tate, and that Main acquiesced to this understanding by saying "Yup." The court regarded as significant that Main did not invoke his *Miranda* rights during his first interview with Tate.

¶19    Main's conversation with Waldron was a free-flowing exchange covering a variety of topics. Following his comment about calling his mother, Main immediately launched into a discussion with Waldron about international affairs. It was not reasonable for the officer to believe that Main was then requesting an attorney and that questioning should immediately cease. Main acknowledged Waldron's explanation that Main would be given his *Miranda* advisory when Tate became available and that he could then exercise his right to contact his lawyer. Tate so advised Main, but Main did not request a lawyer. We affirm the District Court's determination that Main did not clearly or unequivocally request a lawyer. *See United States v. Ervin*, 2006 U.S. Dist. LEXIS 26391 at *41 (W.D. N.C. Mar. 23, 2006) (suspect's statement that he had earlier asked another officer "to call my dad or lawyers" was found to be an insufficient request).[4]

---

[4] With this conclusion we do not reach Main's additional arguments—all premised on the assumption that Main unequivocally invoked his right to counsel—that he could anticipatorily invoke his right to an attorney for a future interrogation and that Main's statement to Waldron, which was suppressed by the District Court, can be used to void a subsequent interrogation. Neither do we address whether Main's dialogue with Waldron was a custodial interrogation. *See*

¶20 Main then argues that his intoxication and the officers' failure to give him a breathalyzer test invalidated his waiver of *Miranda* rights. He notes that intoxication has been considered by other jurisdictions in determining whether to invalidate a *Miranda* waiver. *See e.g. United States v. Korn*, 138 F.3d 1239, 1240 (8th Cir. 1998).

¶21 A suspect may waive his 5th Amendment rights if such a waiver is made voluntarily, knowingly, and intelligently. *Gittens*, ¶ 14; *Miranda*, 384 U.S. at 444, 86 S. Ct. at 1612. The United States Supreme Court has stated:

> The inquiry has two distinct dimensions. *Edwards v. Arizona*, *supra*, at 482; *Brewer v. Williams*, 430 U.S. 387, 404 (1977). First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived. *Fare v. Michael C.*, 442 U.S. 707, 725 [99 S. Ct. 2560, 2572] (1979). See also *North Carolina v. Butler*, 441 U.S. 369, 374-375 [99 S. Ct. 1755, 1758] (1979).

*Moran v. Burbine,* 475 U.S. 412, 421, 106 S. Ct. 1135, 1141 (1986); *see also Berghuis v. Thompkins*, ___ U.S. ___, 130 S. Ct. 2250, 2260 (2010). We have likewise stated that "a valid waiver must include not merely a comprehension of the benefits being abandoned, but also an actual relinquishment of those benefits, as evidenced by the actions or statements of the accused." *State v. Blakney*, 197 Mont. 131, 138, 641 P.2d 1045, 1049-50 (1982). The "existence of a valid waiver 'must depend, in each case, upon the

---

*Jones*, ¶ 27 ("We conclude that regardless of whether the police subjected Jones to a 'custodial interrogation,' Jones's statements that he was 'through talking' do not constitute an unequivocal invocation of his right to counsel . . . .").

particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.'" *Blakney*, 197 Mont. at 138, 641 P.2d at 1049 (citation omitted). Other valid considerations include "the age, education, and intelligence of the accused, and his capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights." *Blakney*, 197 Mont. at 138, 641 P.2d at 1049 (citing *e.g. Fare*, 442 U.S. at 725, 99 S. Ct. at 2572; *Butler*, 441 U.S. at 373, 99 S. Ct. at 1758). We have considered a defendant's responses to questions while supposedly intoxicated as one factor to consider in the totality of the circumstances as to whether a waiver was made knowingly, intelligently, and voluntarily. *State v. Cassell*, 280 Mont. 397, 403, 932 P.2d 478, 481-82 (1996).

¶22 In *State v. Gleed*, 220 Mont. 56, 59, 713 P.2d 543, 544-45 (1986), we affirmed a district court's denial of a motion to suppress as to waiver when the defendant was 21 years old, familiar with the criminal justice system due to prior felony convictions, had earned his GED, was of "at least" average intelligence, gave no indication to being under the influence of drugs or alcohol, and stated he understood the *Miranda* advisory. Similarly, we affirmed a district court's denial of a motion to suppress and determined that a waiver was made knowingly, intelligently, and voluntarily despite the defendant's claim to be intoxicated. *Cassell*, 280 Mont. at 403, 932 P.2d at 481-82. Cassell was 43 years old, had a lengthy criminal record and was familiar with the criminal justice system and police interrogation methods, and appropriately responded to police questions, thereby refuting his intoxication claim. *Cassell*, 280 Mont. at 403, 932 P.2d at 481-82.

12

In *Gittens*, we determined the district court did not err in concluding the State met its burden in proving the defendant voluntarily, knowingly, and intelligently waived his *Miranda* rights. *Gittens*, ¶ 29. Although there was no audio recording of the *Miranda* advisory or of the defendant's waiver, a deputy testified that he read the *Miranda* advisory from a pre-printed card, and the defendant responded that he understood those rights, voluntarily followed the deputy out to the patrol car, did not indicate he did not want to talk, and did not avail himself of his *Miranda* rights. *Gittens*, ¶¶ 23-25.

¶23 Here, the District Court found that Main was 46 years old, had graduate school experience, was well-traveled, was articulate, and "showed an ability to make full use of his faculties," as he discussed world politics, racism, the OJ Simpson trial, and raising children in today's world. The Court found that Main had familiarity with the legal system, previous experience with police, attorneys in Los Angeles and Connecticut, had once contacted an attorney on behalf of his nephew for assistance with criminal charges, and demonstrated a clear understanding that he was not obligated to say anything to police until he spoke to an attorney. In determining Main gave a voluntary and knowing waiver of his rights, the District Court found that a *Miranda* rights advisory was given by Tate; that, according to Main, six hours had passed since he last drank alcohol; that Main showed engagement, intelligence, clear thought and speech; and that Main orally, and in writing, waived his right to counsel and voluntarily carried on a conversation with Tate. We note that Tate testified during the suppression hearing that, while Main smelled of

13

alcohol and occasionally slurred his words, "[h]e wasn't stumbling. He answered questions in an articulate manner."

¶24 Main argues that other jurisdictions "have held that alcohol intoxication may invalidate a Miranda waiver," but the cases he cites analyze intoxication as we do: as one factor in the totality of the circumstances. *See e.g. Korn*, 138 F.3d at 1240. We conclude that the District Court's findings of fact were not clearly erroneous, and its conclusions of law were correct. It is clear that Main's waiver "was the product of a free and deliberate choice" and that it was "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it" so as to be voluntarily, knowingly, and intelligently given. *Moran*, 475 U.S. at 421, 106 S. Ct. at 1141.

¶25 ***II. Did the District Court err by denying Main's motion to dismiss for insufficient evidence at the close of the State's case-in-chief?***

¶26 We review the denial of a motion to dismiss for insufficient evidence de novo. *State v. McWilliams*, 2008 MT 59, ¶ 37, 341 Mont. 517, 178 P.3d 121. "Furthermore, determinations of the credibility and weight of testimony are within the exclusive province of the jury, and conflicting testimony does not render the evidence insufficient to support a guilty verdict." *McWilliams*, ¶ 37. A motion to dismiss for insufficient evidence "is appropriate in a criminal trial if, viewing the evidence in a light most favorable to the prosecution, 'no evidence exists upon which a rational trier of fact could find the essential elements of the crime beyond a reasonable doubt.'" *City of Billings v. Albert*, 2009 MT 63, ¶ 13, 349 Mont. 400, 203 P.3d 828 (citations omitted).

14

¶27    Main was charged with deliberate homicide under § 45-5-102(1)(b), MCA, which codifies the "felony murder rule." *State v. Kills on Top*, 241 Mont. 378, 386, 787 P.2d 336, 341 (1990). That statute provides:

> (1) A person commits the offense of deliberate homicide if . . . (b) the person attempts to commit, commits, or is legally accountable for the attempt or commission of . . . aggravated assault, or any other forcible felony and in the course of the forcible felony or flight thereafter, the person or any person legally accountable for the crime causes the death of another human being.

Section 45-5-102(1)(b), MCA. "[T]he purpose of the felony-murder rule is to ensure that people who engage in dangerous acts likely to result in death are held responsible for any resulting deaths, whether or not the acts were planned or premeditated. The felony-murder rule creates an alternate means of holding one responsible for reckless actions likely to result in death." *State v. Burkhart*, 2004 MT 372, ¶ 36, 325 Mont. 27, 103 P.3d 1037 (internal citation omitted). Under the felony murder rule, the prosecution does not need to prove the "'purposely or knowingly' element of the crime of deliberate homicide." *Kills on Top*, 241 Mont. at 387, 787 P.2d at 341 (citations omitted). Instead, the defendant's intent to commit the underlying felony supplies the intent for all subsequent consequences, including homicide. *State v. Nichols*, 225 Mont. 438, 449, 734 P.2d 170, 176 (1987). A causal connection between the felonious act and the victim's death must be present. *Kills on Top*, 241 Mont. at 387, 787 P.2d at 342.

¶28    Therefore, the state here had to prove 1) commission or attempted commission of, or accountability for, a forcible felony, 2) the occurrence of a death during the course of or flight after the felony, and 3) a causal connection between the felony and the death.

15

*See Kills on Top*, 241 Mont. at 387, 787 P.2d at 342; § 45-5-102(1)(b), MCA. The underlying forcible felony charged against Main was aggravated assault. A person commits aggravated assault, "if the person purposely or knowingly causes serious bodily injury to another." Section 45-5-202(1), MCA.[5] "Serious bodily injury" is defined as "bodily injury that: (i) creates a substantial risk of death; (ii) causes serious permanent disfigurement or protracted loss or impairment of the function or process of a bodily member or organ; or (iii) at the time of injury, can reasonably be expected to result in serious permanent disfigurement or protracted loss or impairment of the function or process of a bodily member or organ." Section 45-2-101(66)(a), MCA. To establish Main was "legally accountable" for aggravated assault under the felony murder statute, the State was required to prove that "either before or during the commission of an offense with the purpose to promote or facilitate such commission, he solicits, aids, abets, agrees, or attempts to aid such other person in the planning or commission of the offense." Section 45-2-302(3), MCA. We thus review the evidence which the State introduced to prove these elements.

¶29    Main's third interview with Tate was admitted as evidence. In that interview, Main admitted that he had fought with Kvelstad, although he "did not kill him." Main said this altercation "started as a little pushing argument" between him and Kvelstad and then escalated into a "[b]ar room brawl." Main said that "everything was ok after the

---

[5] Both Main and the State appear to reference the definition of aggravated assault set forth in § 45-5-202(1), MCA (2009). As we noted previously, the 2005 version of the statute applies, and we do not address Main's arguments that pertain to the 2009 version.

scuffle" but admitted that there were "a few little knots and bruises" and blood on Kvelstad. Waldron testified that, on the night of the incident, Main "had blood on his sweatshirt, he had blood on the cuffs of his pants, he had some blood on his hands, and he had blood on his forehead."

¶30 Oats testified that when he entered Snow's residence, Kvelstad's face was "pretty pummeled, not really distinguishable facial features." Observing a picture of Kvelstad's face taken after his death, Barkus testified that he couldn't recognize Kvelstad in the picture and that police at the scene had to identify him by his tattoos. Waldron testified that Kvelstad's body "was just beaten severely. His head was large, swollen, black and blue marks, swollen to the point -- or puffy to the point that it was obscuring some of his facial features." Sheriff and Coroner Greg Szudera testified that "the body around the face and the eyes and the nose was severely beaten" which he believed was caused by some form of blunt force trauma. Both Szudera and Waldron testified Kvelstad's facial injuries looked "life threatening," though Szudera acknowledged that it was possible to sustain "very gruesome appearing blunt force injuries . . . from which a person can totally recover."

¶31 In his testimony, Red Elk recalled that "Lucky [Kvelstad] was talking, and then Main gets all mean and angry and starts cussing at Lucky because he was speaking Native, I assumed. He got offended by that. And then I was at -- after that occurred he still kept picking on him. And he just kept going on and on talking about the AIM [American Indian] Movement and the Pilgrims, Thanksgiving." Red Elk continued:

17

"Every time Lucky would say he was sorry, or describe that he means no offense then Main comes back up with some other argument toward him, like more aggressively and saying, no, or cursing at him." Red Elk stated that "[a]fter [Main] verbally assaulted [Kvelstad], after Lucky was going to get up and walk around, Main choked him out . . . and that was mainly what he did, twice." Red Elk indicated that Main "had his arm around [Kvelstad's] neck and he squeezed tightly and had his other arm around his head." Due to this choke-hold, Kvelstad "completely passed out it would seem. He didn't move at all." After Kvelstad regained consciousness, Red Elk testified that "[h]e was shocked. He was shaking. He was -- I think, he was just scared at the time and confused." Red Elk testified that Skidmore "choked him out" the second time. Kvelstad passed out and then "was more confused and really dazed" and "stumbling as he was trying to get up." Then, a "couple seconds after Lucky came through . . . Main came and choked him again." Red Elk said, "it was really fast. He had just -- his eyes were closing and he looked like he was going to kill him right there."

¶32 Red Elk acknowledged that Kvelstad "recovered" after he had been choked, but that while Kvelstad was passed out, "Main came up with the idea of trying to kill Lucky, as it would seem. I had no idea why he would be saying it. But he came up with the idea of killing him. And then Norquay came butting in and they were just thinking about how they would do this and why they would kill him." Red Elk reported that Main had told Kvelstad "I could break you in half" or "I could kill you," or words to that effect, although Red Elk initially thought those comments were "typical of drunk talk."

18

¶33    Snow testified that Main put a "sleep hold" on Kvelstad twice and that Kvelstad lost consciousness when choked. Snow testified that Kvelstad made "gurgling" noises when being choked. Snow testified that Main came from the living room and told her that Kvelstad "was dead." Snow testified that, at that point, Main asked her to tell law enforcement that they "were in the back room making love," which was not true.

¶34    About the involvement of Norquay, Red Elk acknowledged that Norquay "start[ed] up with Lucky" after Main's verbal assault. Red Elk noted that Norquay "was sort of like backing Main mostly . . . ." Red Elk testified that, after Kvelstad had regained consciousness from a choking, Norquay was "shadow boxing [Kvelstad], slapping him, laughing at him. I think he was cursing at him," although Norquay did not hit Kvelstad in a manner that would make him bleed. Red Elk testified that Norquay exhibited a desire to sexually assault Kvelstad in that Norquay "pulled down his pants, he unbuckled his belt and he was trying to pull down Lucky's pants." According to Red Elk, "I thought [Norquay] was going to rape him right there." Snow added that Norquay was making "humping motions" on Kvelstad. Snow also testified that Norquay pulled the string from his sweatshirt and placed it on the table. Oats testified that when he arrived at Snow's residence, Norquay told him that there was nothing wrong with Kvelstad and to "[l]eave him alone. He's all right," when actually Kvelstad was then dead or near dead.

¶35    Norquay reported to Tate shortly after the crime that "he had witnessed James Main beat Lloyd Kvelstad up." Norquay told Tate that "[Main] had choked [Kvelstad]

19

and that he had kicked him and he was hitting him, as well." Norquay also told Tate that he believed Main had used his hoodie string to choke Kvelstad.

¶36 Medical Examiner and forensic pathologist Walter Kemp performed Kvelstad's autopsy. He testified to the ligature around Kvelstad's neck, bruising to Kvelstad's ear, eyelids, tongue and back, abrasions to the cheek, chin, nose and left elbow, and lacerations of the forehead, lips, and right forearm. He testified about "petechia[e]" or "pinpoint hemorrhages" in Kvelstad's right eye, noting that petechiae hemorrhages are often associated with strangulation and blunt force injuries. Kemp agreed that a choke-hold could cause petechiae. Kemp also testified that Kvelstad sustained internal head bleeding and a fractured rib. Kemp indicated that Kvelstad sustained blunt force injuries consistent with being hit by a fist or being kicked.

¶37 Kemp testified that not all of Kvelstad's injuries were life-threatening and that the specific mechanism of his death was uncertain. Although Kvelstad had "very impressive injuries of the face," Kemp did not believe they alone would cause his death and that Kvelstad should have been able to fully recover from these injuries. Likewise, Kemp did not believe Kvelstad's hemorrhage around the brain or rib fracture would have caused his death. Kemp agreed that "being choked" could "create a risk, a medical anatomical risk" due to oxygen deprivation to the brain. If the choke-hold was "not maintained, blood starts flowing to the brain again, [and] the person would be fine." However, a choke-hold could result in death "[i]f the blood is pinched off from the brain long enough for the cells to start dying." Kvelstad's blood alcohol content was .24, which Kemp described as

20

"high." Kemp testified that "non-lethal head injuries, combined with a high alcohol level, can cause somebody's death," and that "it's definitely one possibility that his head injuries and the alcohol caused his death," although he could not conclude, to a medical certainty, that Kvelstad died in this way.

¶38 Regarding the ligature, Kemp testified that the lack of significant abrasions and bruising to Kvelstad's neck could indicate the ligature was placed on Kvelstad's neck after he was already dead or incapacitated, but that he couldn't "say for sure that [Kvelstad] was not alive at the time the ligature was placed." If Kvelstad had been alive at the time the ligature was placed around his neck, Kemp said, "that would have caused his death." Kemp indicated there could be several possibilities as to the mechanism of death, including that Kvelstad had been manually strangled. He listed Kvelstad's cause of death as "[h]omicidal violence, including blunt force injuries of the head and probable ligature strangulation."

¶39 Blood and other DNA evidence was collected from Snow's residence, and the suspects' and witnesses' clothing. Blood was found in the living room, bathroom, and kitchen and living room ceilings. The blood found on the ceilings matched[6] Kvelstad's DNA. DNA from the bathroom shower door matched that of Kvelstad, and a partial DNA profile from the toilet bowl was consistent with Kvelstad's DNA. DNA found on the bath tub matched Main. There were 73 blood stains found on Main's right boot. In particular, the tongue of Main's boot had "a very large thick stain" which was "not a stain

---

[6] The terms used herein to describe the DNA evidence, such as "matched" and "consistent with," were provided by expert testimony and report.

21

that you would have just picked up walking around, or having walked through blood that was possibly on the floor," according to a crime lab serologist. The major DNA profile from this stain matched that of Kvelstad. Main's overalls had 150 blood stains, and DNA testing was conducted on five stains: three matched Kvelstad's DNA and two matched Main's DNA. Two of the DNA tests performed on the blood from Main's hands matched that of Main. Norquay's jeans had 104 blood stains, and two were tested: one matched Main's DNA, and the major DNA profile from the other stain likewise matched Main. Norquay's sweatshirt had 21 blood stains, two which were tested: the major DNA profile from the stain on the hood matched Main, and the stain on the right sleeve indicated a major DNA profile matching Kvelstad. Norquay's shoe had 37 blood stains, one of which was tested and was consistent with Kvelstad's DNA. Norquay's jacket had 143 blood stains. Of the seven stains tested for DNA, five matched Main. A forensic scientist specializing in impression evidence analyzed the footprint impressions found on Kvelstad's sweatshirt, and found one which was consistent with the tread on Norquay's shoe.

¶40 Main argues that the State's evidence did not establish that he committed the underlying felony, aggravated assault, on Kvelstad. He points to Kemp's testimony[7] to argue that Main's earlier assaults did not inflict serious injuries and did not cause

---

[7] Main cites to both Kemp and defense expert Thomas Bennett's testimony in support of his contention that Main's assaults on Kvelstad were not serious and did not cause Kvelstad's death. However, Main's issue on appeal is that "the district court erred by denying Main's motion to dismiss *at the close of the State's case.*" (Emphasis added.) Bennett testified during the defense's case-in-chief, following the conclusion of the State's case-in-chief and denial of the motion, and thus was not part of the District Court's consideration of the issue.

Kvelstad's death, citing the holding in *State v. Weinberger*, 206 Mont. 110, 671 P.2d 567 (1983), where we determined that because the underlying felony had not been proven, the felony murder conviction also failed. The State responds that lethality is not a requirement for serious bodily injury and that there was sufficient evidence to permit the case to be decided by the jury.

¶41 The State's evidence showed that Main was in a verbal and physical altercation with Kvelstad. Main was seen "choking out" Kvelstad twice to the point of unconsciousness and causing concern that Kvelstad was going to be killed. Main told Kvelstad that "I could break you in half" or words to that effect, further evidence from which a jury could infer an intention by Main to assault Kvelstad. Kvelstad suffered a severe enough beating for Coroner Szudera and Waldron to opine that the injuries were life-threatening, for his blood to be deposited on the ceilings, floors and walls of various rooms of the residence, and to make him unrecognizable to law enforcement. The jury could infer that Main and Norquay were both involved in this beating since Kvelstad's DNA was found on both of their clothing and Main's DNA was found on Norquay's clothing. We conclude the jury could have inferred that Main inflicted or was accountable for a serious physical attack upon Kvelstad, sufficient to "create[] a substantial risk of death" or injuries which "at the time of injury, can reasonably be expected to result in serious permanent disfigurement or protracted loss or impairment . . . ." Section 45-2-101(66)(a)(i),(iii), MCA. The jury was instructed on the lesser-included offense of assault and could have found Main guilty of this lesser charge,

23

but determined that the evidence presented was sufficient to establish Main's participation in an aggravated assault upon Kvelstad.

¶42 Main also argues that even if the elements of aggravated assault were satisfied, the State failed to prove the necessary causation between the aggravated assault and Kvelstad's death. Generally, "[c]onduct is the cause of a result if: (a) without the conduct the result would not have occurred . . . ." Section 45-2-201(1)(a), MCA. For purposes of the felony murder statute, we have explained the causal connection required "'is that the death actually occurred during the underlying felony or the flight thereafter.'" *Burkhart*, ¶ 36 (quoting *State v. Cox*, 266 Mont. 110, 119, 879 P.2d 662, 668 (1994)). We have further explained that "'[i]t is necessary . . . to show that the conduct causing death was done in furtherance of the design to commit the felony. Death must be a consequence of the felony . . . and not merely coincidence.'" *Weinberger*, 206 Mont. at 115, 671 P.2d at 569 (quoting *Commonwealth v. Redline*, 137 A.2d 472, 476 (Pa. 1958)); *see also State ex rel. Murphy v. McKinnon*, 171 Mont. 120, 127, 556 P.2d 906, 910 (1976) (citation omitted) ("'Something more than a mere coincidence of time and place between the wrongful act and the death is necessary.'").

¶43 The jury received evidence about Main's assaultive behaviors toward Kvelstad and his admission of having a "[b]ar room brawl" with Kvelstad. The evidence included Main telling Kvelstad "I could break you in half" and "I could kill you," or words to that effect, and initiating a conversation with Norquay about killing Kvelstad. There was evidence of Kvelstad's physical injuries and blood and DNA evidence of Kvelstad's

24

blood on Main, as outlined above. This evidence permitted the jury to infer that Main committed or was accountable for an attack involving blunt force trauma on Kvelstad. The jury heard Kemp's testimony[8] that Kvelstad could have died from a combination of blunt force trauma and high alcohol intoxication, or strangulation. Main told Snow that Kvelstad was dead and asked her to lie about Main's activities at the time of death. This evidence was sufficient to permit a jury to infer that Main inflicted or was accountable for blunt force trauma upon Kvelstad that was causally connected to his death; stated another way, to infer that the conduct causing death was done in furtherance of the aggravated assault which Main committed or was accountable for. Main emphasizes that there was "no credible evidence linking" him to the ligature but, as in *Cox*, "[p]roof that [Main] actually committed the physical act that resulted in the death of [the victim] is not required." *Cox*, 266 Mont. at 119, 879 P.2d at 668. "All conspirators in a plot to commit a crime are equally guilty of deliberate homicide if during the course of the commission of the crime a death results which is directly attributable to the plot to commit the crime." *Weinberger*, 206 Mont. at 114, 671 P.2d at 569.

¶44 We view the evidence "in a light most favorable to the prosecution to determine if any trier of fact could have found the essential elements of the crime beyond a reasonable

---

[8] Main asserts that Kemp's testimony was "improper and should not have been allowed" because it did not meet the requisite degree of medical certainty. However, Main's trial counsel did not object to Kemp's testimony and used portions of Kemp's testimony, along with Main's expert witness testimony, to argue for a defense verdict. As such, the jury permissibly considered the evidence. *See State v. LaMere*, 2003 MT 49, ¶ 22, 314 Mont. 326, 67 P.3d 192 (citation omitted) (If evidence is properly before the jury, then resolving evidence conflicts, judging witness credibility and fact-finding are "'acts uniquely within the province of the jury.'").

25

doubt." *LaMere*, ¶ 23. This approach "requires that we view the evidence and all inferences to be drawn therefrom in the strongest light possible which supports establishment of the State's case." *LaMere*, ¶ 20. We conclude the evidence was sufficient to permit the jury to find the elements of the crime had been committed beyond a reasonable doubt. The District Court did not err in denying Main's motion to dismiss for insufficient evidence.

¶45 ***III. Was Main denied effective assistance of counsel?***

¶46 Main argues that we should review three errors committed by trial counsel, Kenneth Olson (Olson). The State responds that Main's ineffective assistance of counsel claims should be addressed in a postconviction proceeding.

¶47 The Sixth Amendment of the United States Constitution and Article II, Section 24 of the Montana Constitution guarantee a defendant the right to effective assistance of counsel. *State v. Sartain*, 2010 MT 213, ¶ 29, 357 Mont. 483, 241 P.3d 1032. We review claims of ineffective assistance of counsel under the two-prong test articulated in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052 (1984). *Sartain*, ¶ 29. A defendant must prove that (1) counsel's performance was deficient or fell below an objective standard of reasonableness, and (2) counsel's performance prejudiced the defense by demonstrating that there was a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *State v. Kougl*, 2004 MT 243, ¶ 11, 323 Mont. 6, 97 P.3d 1095; *see also Whitlow v. State*, 2008 MT 140, ¶ 10, 343 Mont. 90, 183 P.3d 861. Both prongs of this test must be satisfied in order to prevail on

an ineffective assistance of counsel (IAC) claim. *Whitlow*, ¶ 11. "Ineffective assistance of counsel claims present mixed issues of fact and law, which we review de novo." *Sartain*, ¶ 11.

¶48 Before reviewing IAC claims on direct appeal, we first consider whether the claims are more appropriate for a postconviction relief proceeding. *Sartain*, ¶ 30. Where IAC claims are based on facts of record, they must be raised on direct appeal; however, if such allegations cannot be documented by the record, the claims must be raised by petition for postconviction relief. *State v. Gunderson*, 2010 MT 166, ¶ 70, 357 Mont. 142, 237 P.3d 74. We have explained that record-based actions are those which explain "why" counsel took, or failed to take, action in defense of his or her client. *State v. White*, 2001 MT 149, ¶ 20, 306 Mont. 58, 30 P.3d 340.

¶49 Main avers Olson was ineffective because he did not object, until after the District Court had already issued its ruling, to the admission of a crime scene video. While the failure to raise an objection is generally record-based, we have also said that "decisions regarding the timing and number of objections lie within counsel's tactical discretion and, thus, should not be considered on direct appeal." *State v. Earl*, 2003 MT 158, ¶ 41, 316 Mont. 263, 71 P.3d 1201 (citing *White*, ¶¶ 15-16). Main contests the timing of his counsel's objection, and we decline to address the issue on direct appeal.

¶50 Main next argues that Olson failed to make an offer of proof regarding possible "gang evidence," which resulted in a waiver of the issue on appeal. In *State v. Olsen*, a defendant alleged her counsel was ineffective for failing to make an offer of proof

regarding an expert witness. *State v. Olsen*, 2004 MT 158, ¶ 17, 322 Mont. 1, 92 P.3d 1204. We noted "while attorneys will state on the record their reasons for . . . making an offer of proof during trial, they do not state their reasons for not doing so." *Olsen*, ¶ 17. Because the record in *Olsen* was silent, we held that defendant's IAC assertions were more appropriate for postconviction relief. *Olsen*, ¶ 17. Here, attorney Olson questioned Snow about a particular gang during cross-examination. However, the prosecutor objected on relevancy grounds, and the judge asked Olson if an offer of proof needed to be made. Subsequently, an off-the-record bench conference was held, and the objection was ultimately sustained. Due to this off-record conference, the record is silent as to "why" Olson did not make an offer of proof. This claim is more appropriately addressed in a petition for postconviction relief.

¶51 Lastly, Main contends that Olson failed to object to Kemp's testimony that a combination of blunt force trauma and intoxication may have caused Kvelstad's death. Main argues this testimony did not meet the minimum standard of reliability for admission. We have noted that "[a] defense counsel's use of objections lies within his or her discretion" and "[i]t is also not beyond the realm of reasonableness that defense counsel would not object during certain times of the trial so as not to confuse the jury or bring undue attention to the prosecution's case." *Clausell v. State*, 2005 MT 33, ¶ 20, 326 Mont. 63, 106 P.3d 1175.

¶52 While not objecting to this portion of Kemp's testimony, Olson vigorously cross-examined Kemp and distinguished Kemp's testimony from the defense expert's

28

testimony as to the cause of Kvelstad's death. He further utilized these differences in his opening and closing arguments. It is possible that Olson, rather than objecting, chose to contrast Kemp's testimony with the defense expert's testimony as a matter of trial strategy, but the record is silent as to "why" Olson chose to proceed in this manner, if indeed he did. Main fails to demonstrate that no plausible justification exists for his counsel's alleged failure to object to Kemp's testimony. *See State v. Upshaw*, 2006 MT 341, ¶¶ 34, 40, 335 Mont. 162, 153 P.3d 579. "If the record does not fully explain why counsel failed to object to the admission of evidence, the matter is best suited for postconviction proceedings." *State v. St. Germain*, 2007 MT 28, ¶ 35, 336 Mont. 17, 153 P.3d 591. We decline to address this issue on appeal.

¶53 As to Olson's failure to object to Kemp's testimony, Main also urges this Court to apply plain error review. Plain error review is invoked sparingly, and "only in situations that implicate a defendant's fundamental constitutional rights when failing to review the alleged error may result in a manifest miscarriage of justice, leave unsettled the question of the fundamental fairness of the proceedings, or compromise the integrity of the judicial process." *State v. Thorp*, 2010 MT 92, ¶ 23, 356 Mont. 150, 231 P.3d 1096. To obtain plain error review, "the appealing party must (1) show that the claimed error implicates a fundamental right and (2) 'firmly convince' this Court that failure to review the claimed error would result" in any of the situations outlined above. *State v. Norman*, 2010 MT 253, ¶ 17, 358 Mont. 252, 244 P.3d 737 (citation omitted). This Court has discretion whether to apply plain error review. *State v. Finley*, 276 Mont. 126, 137, 915 P.2d 208,

29

215 (1996*), overruled on other grounds, State v. Gallagher*, 2001 MT 39, ¶ 21, 304 Mont. 215, 19 P.3d 817. Main has not satisfied this burden, and we decline to apply plain error review.

¶54 Affirmed.

/S/ JIM RICE

We concur:

/S/ JAMES C. NELSON
/S/ BETH BAKER
/S/ MICHAEL E WHEAT

Chief Justice Mike McGrath, specially concurring.

¶55 In general, I concur with the majority's disposition of Main's appeal. I write separately however, because I disagree that Main's ineffective assistance of counsel (IAC) claim concerning trial counsel's failure to object to Dr. Kemp's testimony is better suited for postconviction relief proceedings. Opinion, ¶ 53. This IAC claim can be resolved on direct appeal; Main has failed to establish that counsel was deficient or that he was prejudiced by the lack of objection.

¶56 First, Main's IAC claim is appropriate for direct appeal. An IAC claim that can be decided on the district court record is a record-based claim that must be raised on direct appeal. *State v. Lindsey*, 2011 MT 46, ¶ 43, 359 Mont. 362, 249 P.3d 491; *State v.*

*Meredith*, 2010 MT 27, ¶ 51, 355 Mont. 148, 226 P.3d 571 (citing *Petition of Hans*, 1998 MT 7, ¶ 42, 288 Mont. 168, 958 P.2d 1175). "The allegation that counsel failed to object to an alleged error in the district court is a record-based claim of ineffective assistance." *Lindsey*, ¶ 43; *Hagen v. State*, 1999 MT 8, ¶¶ 19-20, 293 Mont. 60, 973 P.2d 233 (holding that IAC claim premised on counsel's failure to object was procedurally barred in postconviction proceedings because it was record based and should have been brought on direct appeal). Unlike omissions that necessitate consideration of facts outside of the record, an alleged failure to object "is a fact easily documented by reviewing the record, and we have decided claims of this kind on direct appeal on numerous occasions." *Hagen*, ¶ 20 (citing *State v. Campbell*, 278 Mont. 236, 250, 924 P.2d 1304, 1313, (1996); *State v. Bradley*, 262 Mont. 194, 197-99, 864 P.2d 787, 789 (1993); *State v. Schoffner*, 248 Mont. 260, 268, 811 P.2d 548, 553 (1991); *State v. Probert*, 221 Mont. 476, 481, 719 P.2d 783, 786 (1986)); s*ee Meredith*, ¶¶ 48-59. In the case at hand, Main has raised an IAC claim based on trial counsel's failure to object to Kemp's testimony concerning alcohol consumption and blunt force trauma. This omission is clearly documented in the record. *Meredith*, ¶ 52.

¶57 Second, turning to the substance of Main's IAC claim, he fails to establish either prong of the *Strickland* test. As noted, there are two requirements for a defendant to establish an IAC claim: (1) counsel's performance was deficient, and (2) the deficient performance prejudiced the defendant's defense. *Lindsey*, ¶ 43; *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984). "A defendant must meet

both parts of the test to be entitled to relief, and an insufficient showing under one part obviates the need to even address the other." *Lindsey*, ¶ 43 (citing *Whitlow v. State*, 2008 MT 140, ¶ 11, 343 Mont. 90, 183 P.3d 861).

¶58 The record reveals that trial counsel clearly chose not to object for tactical reasons. Counsel both knew the substance of Kemp's testimony and relied upon it to buttress Main's defense. In his opening statement, Main's counsel explained that Kemp was going to present a "theory" about the effects of a combination of intoxication and blunt force injuries. He contrasted this "theory" with Main's expert, Bennett, who offered a medically-certain opinion that Kvelstad died of strangulation. During cross-examination, Main's counsel challenged the basis of Kemp's theory, and forced Kemp to concede that Kvelstad's blunt force injuries were non-fatal. Subsequently, counsel elicited from Kemp a concession that Kvelstad would have died from ligature strangulation if he had been alive at the time the ligature was applied. In other words, counsel utilized Kemp's testimony in a clear attempt to weaken the State's case and strengthen Main's. Finally, in his closing statement, counsel for Main once again contrasted Kemp's "theory" with Bennett's medical certainty and pointed out Kemp's concessions. The record here is sufficient to decide Main's IAC claim, and there is no need to consult non-record based information to explain trial counsel's tactics. *State v. St. Germain*, 2007 MT 28, ¶ 35, 336 Mont. 17, 153 P.3d 591.

¶59 Main argues that counsel's performance was deficient because there was no strategic reason to allow Kemp's testimony about the combination of intoxication and

32

blunt force trauma. "The first prong carries a strong presumption in favor of the State, as counsel possesses a wide latitude in determining what tactics to employ when defending a client." *St. Germain*, ¶ 33 (citing *State v. Kougl*, 2004 MT 243, ¶ 11, 323 Mont. 6, 97 P.3d 1095). It is the defendant's burden to overcome that presumption. *Whitlow*, ¶ 21. As noted above, Main's counsel did in fact have an obvious tactical purpose in allowing Kemp's testimony. Without more, Main fails to show that his counsel's performance "fell below an objective standard of reasonableness measured under prevailing professional norms and in light of the surrounding circumstances." *Whitlow*, ¶ 21.

¶60     Main's IAC claim also fails *Strickland*'s prejudice prong. Rather than kicking this issue down the road to postconviction proceedings, the Court could dispose of this IAC claim on the prejudice prong alone. When an alleged deficient performance "does not prejudice a defendant to the degree that the outcome of the trial is implicated, the claim may be dismissed without evaluating counsel's performance." *State v. Harris*, 2001 MT 231, ¶ 19, 306 Mont. 525, 36 P.3d 372 (citing *Strickland*, 466 U.S. at 697, 104 S. Ct. at 2069). "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Strickland*, 466 U.S. at 697, 104 S. Ct. at 2069; *accord Becker v. State*, 2010 MT 93, ¶ 11, 356 Mont. 161, 232 P.3d 376. Disposal of IAC claims on the prejudice prong "ensure[s] that ineffectiveness claims not become so burdensome to defense counsel that the entire criminal justice system suffers as a result." *Strickland*, 466 U.S. at 697, 104 S. Ct. at 2069. We would do well to heed the Supreme Court's advice.

33

¶61 The majority's focus on "why" counsel failed to object is irrelevant in a prejudice analysis. Opinion, ¶ 53. Although not required in this case, counsel's rationale may be procedurally pertinent when addressing *Strickland*'s first prong. *See State v. White*, 2001 MT 149, ¶¶ 10-20, 306 Mont. 58, 30 P.3d 340. However, such an inquiry is unnecessary when addressing *Strickland*'s second prong. *See Lindsey*, ¶¶ 43-47; *Becker*, ¶ 11; *State v. DeMary*, 2003 MT 307, ¶¶ 27-30, 318 Mont. 200, 79 P.3d 817. The prejudice prong is unconcerned with "why" trial counsel acted or failed to act. Rather, the focus is on the effect of counsel's action or inaction, i.e. whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Becker*, ¶ 11 (quoting *Strickland*, 466 U.S. at 697, 104 S. Ct. at 2069). "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Becker*, ¶ 11 (quoting, *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068). Such is not the case here.

¶62 Assuming arguendo that counsel's failure to object was deficient *and* the objection would have been sustained, Main still cannot establish a reasonable probability that the trial result would have been different. As the majority aptly points out, there was sufficient evidence in the record for a jury to find Main guilty beyond a reasonable doubt. Opinion, ¶¶ 26-45. Importantly, there was sufficient evidence to convict Main in the absence of testimony concerning the combination of alcohol and blunt force trauma. Opinion, ¶¶ 39-45. In short, Main's alleged error does not undermine confidence in the jury verdict, and he cannot establish that he was prejudiced.

¶63 There is no reason to relegate Main's failure-to-object IAC claim to postconviction proceedings. Main has presented a record-based claim but has failed to show that counsel's performance was deficient. Moreover, there is no reason to relegate an IAC issue to postconviction proceedings where *Strickland*'s prejudice prong is dispositive on direct appeal. This promotes timely resolution of IAC claims while a defendant is still represented by appellate counsel and avoids unnecessary grading of trial counsel's performance. *Strickland*, 466 U.S. at 697, 104 S. Ct. at 2069. Sending this IAC claim to postconviction proceedings puts off until tomorrow what should have been resolved today.

/S/ MIKE McGRATH